[1] Reported in 13 N.W.2d 487.
This proceeding was commenced in 1942 by two friends of Mrs. Rose Masters to have her restored to capacity after she had been adjudged feeble-minded and committed as such to a state school. The probate court, after hearing the testimony of petitioners and two other lay witnesses in support of the petition for restoration, granted a motion to "disallow" it on the ground that "none of the witnesses were experts in mental cases." On appeal, the district court, after hearing both lay and expert testimony, pro and con, found that Mrs. Masters was feeble-minded, and in all things affirmed the order of the probate court. The appeal is from the judgment.
The problems presented are largely sociolegal in nature, and their proper disposition requires a review of the "case history."
Mrs. Masters, who was born in 1898, married in 1923. She and her husband lived on rented farms but had not prospered in terms of worldly goods. Not having accepted the principle of planned parenthood, they had, over a period of 19 years, become the parents of a family of ten apparently normal children. The ever-increasing family was not an unmixed blessing, for with it came a depression, poverty, want, and, finally, application for poor relief. At this stage the social agencies intervened. Beginning in 1937, the family received regular visits from county welfare workers, who concluded that unrestricted fertility on the part of Mr. and Mrs. Masters was not consistent with their economic and social capacities.
The conditions found at the Masters home were thus described by the secretary of the welfare board at the trial in district court:
"The housekeeping was very poor, to say the least. There was never any semblance of meals on the table. There were just bits of food. All I ever saw on the table was bread and syrup; and the bread would never be sliced, it would be torn off in the middle. *Page 555 
The clothes would be piled in the corner, rumpled together, day after day after day and week after week after week. The children were always tattered, hair long, white-looking, tired-looking. And the chickens, one would hop over a chicken every once in a while — they were allowed to go in and out of the house. The beds were not clean." The children were described as "white, drawn-looking, tired; and their dress would be tattered, rumpled garments. And their faces were never clean; their hands were dirty. They were not attractive children. They were not children you would pick up and want to make of."
The first solution attempted, according to this witness, was to place a housekeeper in the home, but this proved impractical. As a final solution of the social problem, the family was broken up. Five of the children were sent to St. Elizabeth's Orphanage at Wabasha, three were placed in county boarding homes, both parents were adjudged feeble-minded, and the mother committed to the State School for Feeble-Minded. At the time of the trial below, the oldest son was in the army, as was the second at the time of the oral argument before this court.
Time was, and not so far past, when parents might "point with pardonable pride" to a family of ten or more children. Even in this modern age of birth control and social welfare agencies, the circumstance of being the mother of an unusually large family, as measured by present standards, should not label a woman as a moron. It is therefore understandable why petitioners interpret Mrs. Masters' commitment to the state school at Faribault as a punishment for having ten children, and assert, in effect, that the natural law and the social law are at war and that she is the battleground. But this is untrue, for it was not the circumstance of her having ten children, but her neglect of them after they arrived that suggested interference by the state through its social agencies.
It is significant, however, that under the heading "abnormal behavior," the report of the welfare board secretary and the county nurse submitted to the probate court recites: "Apparently indifferent *Page 556 
to the needs of cleanliness in her home, it may be the result of repeated child-birth which has exhausted her." Also, that "She should not have any more children from her health standpoint."
1. The original proceedings in probate court resulting in a determination of feeble-mindedness were quite irregular, no formal notice having been given Mrs. Masters of the fact that her own feeble-mindedness was to be inquired into. The only notice she received of any hearing was a summons directed to "Mr. and Mrs. Fred Masters, father and mother of said children," notifying them of the filing of a petition setting forth that their children were "neglected" and "dependent." This summons ordered the parents to appear "with the children named in this petition" and notified them that "When the examination is over you are to appear with the children at the Juvenile Court room for the purpose of determining how we can help you care for your family."
Though Minn. St. 1941, § 525.78 (Mason St. 1940 Supp. § 8992-183), requires only such "notice * * * as the court may direct," such notice must satisfy the constitutional requirement of "due process of law." This prerequisite to a valid commitment cannot be ignored either by the legislature or by a court, proceeding as the legislature prescribes. State ex rel. Blaisdell v. Billings, 55 Minn. 467, 57 N.W. 206, 794,43 A.S.R. 525; Juster Bros. Inc. v. Christgau, 214 Minn. 108,7 N.W.2d 501; 1 Dunnell, Dig. Supp. §§ 1637, 1641.
Notice in commitment proceedings is not always practicable where the person sought to be committed is violently and dangerously insane. But those types of insanity or feeble-mindedness which manifest themselves in harmless symptoms lend themselves to the orderly processes of a formal hearing and adjudication; and in such cases the constitutional mandates must be strictly observed by giving the person under inquiry not only adequate notice of the fact of a hearing and the purpose thereof, but also every opportunity to be heard before the order of commitment is issued. 28 Am. Jur., Insane and Other Incompetent Persons, § 32. *Page 557 
As so emphatically stated in State ex rel. Blaisdell v. Billings, 55 Minn. 474, 57 N.W. 795, supra:
"* * * while the state should take charge of such unfortunates as are dangerous to themselves and to others, not only for the safety of the public, but for their own amelioration, due regard must be had to the forms of law and to personal rights. To the person charged with being insane to a degree requiring the interposition of the authorities and the restraint provided for, there must be given notice of the proceeding, and also an opportunity to be heard in the tribunal which is to pass judgment upon his right to his personal liberty in the future. * * *
* * * * *
"* * * If personal rights are of any consequence, and if they need protection at any time, such notice should precede the examination, not follow it."
Clearly, then, no distinction can be made as to the necessity and sufficiency of notice and opportunity to be heard as between normal and abnormal persons. The life of each is equally sacred; the liberty of each must be equally secure in order that the right to the pursuit of happiness may be equally open. See note, 43 A.S.R. 531.
We do not apologize for discussing these fundamental American concepts; concepts which, in their enthusiasm for social welfare, our governmental agencies charged with the duty of caring for society's less fortunate members often inadvertently overlook or deliberately disregard.
While the petition for restoration here under consideration alleges that "no proper hearing was ever had to determine whether or not Rose Masters was incompetent and feeble-minded," no claim was made upon the trial below that the notice of hearing was insufficient. The record of the probate court shows affirmatively that she was present with counsel at the hearing which resulted in her commitment, and we cannot speculate upon whether or not Mrs. Masters waived the insufficiency of the notice and consented to the jurisdiction of the probate court. There is authority that *Page 558 
lack of notice may be waived (28 Am. Jur., Insane and Other Incompetent Persons, § 15) — a question we do not decide. As the original adjudication and commitment are not attacked here, we shall consider only the regularity of the restoration proceedings.
2. Upon the trial in district court, there was no material dispute as to the case history we have recited; the conflict was only in the opinions expressed by opposing witnesses.
Three of Mrs. Masters' neighbors and friends testified in her behalf, and, after detailing their associations with her and their opportunity to observe her home life as well as her mentality, they variously expressed themselves that she was of sound mind. Illustrative are the following expressions by one witness:
"There is no thought ever came into my head otherwise. I never had occasion to think otherwise but what she was perfectly capable. * * * Her children * * * appeared just as normal as anyone's children. * * * They were healthy, and no disease or no starvation or anything like that."
And these opinions, by another witness:
"She never left her family. * * * I cannot think of anyone who was a better mother than she was to stay with her children and to do everything she could for them. * * * She wasn't probably as good a housekeeper as some people, but she was a very good mother. She spent as much time taking care of her children as anyone would. * * * I think she should be restored to her family, that it is a shame for a mother with small children to be taken from them like that."
A practicing physician and surgeon with some experience in insanity inquisitions, who had talked with Mrs. Masters during her commitment at Faribault and who heard her testimony in court and observed her demeanor on the witness stand, testified that she was "better than a high-grade moron. * * * She may be a little substandard but there are a lot of people substandard."
Mrs. Masters took the witness stand in her own behalf and was subjected to lengthy direct and cross-examination, upon which she *Page 559 
accredited herself in excellent manner, even engaging in occasional repartee with counsel. She was able to do simple multiplication problems without apparent difficulty. A letter written by her prior to the trial established that she was a good penman, that she punctuated and spelled well and had a fair vocabulary. At the school for the feeble-minded, her "literary" talents were pursued to the extent that she not only wrote letters to her husband and children regularly, but also acted as ghost writer for some of the other inmates in their correspondence. However, her principal assignment at the school was the more prosaic job of feeding "butterfly" nightgowns and other types of garments to a power sewing machine, at which she apparently acquitted herself very well. Her after-working hours were spent in taking care of her quarters, and she was complimented by inspectors on the results. She testified finally that she liked her work, had nice congenial women to work with, but that she most certainly would prefer to be at home. She testified that her immediate superior did not find any fault with her, with which counsel for the state fully concurred, saying, "I doubt if she finds any fault with you."
The witnesses in opposition were a psychologist, the executive secretary of the county welfare board, and one of the "boarding-mothers" with whom the baby had been placed.
The psychologist, Mr. Odoroff, was not a graduate physician or psychiatrist and did not claim to be a specialist on questions of insanity. He held a master's degree from the University of Minnesota, where he had majored in educational psychology. For eight years he had been employed by the state as a psychologist for the Bureau of Psychological Service in the Division of Public Institutions, devoting most of his time to conducting tests to determine the intelligence quotient (I. Q.) of persons committed to state institutions as feeble-minded. His qualifications as an expert in this field cannot be questioned. Even laymen are entitled to express in general terms their opinion as to the condition of another's mind, upon a suitable showing that they have had an opportunity to observe the mental characteristics and habits of such *Page 560 
other, so as to form a reasonable conclusion or inference from the facts observed. Swick v. Sheridan, 107 Minn. 130,119 N.W. 791; 22 C. J., Evidence, § 766; 32 C.J.S., Evidence, § 537b.
The testimony of the psychologist would have been more satisfactory, however, had he recited more fully his observations of Mrs. Masters and given more details as to the character and extent of the tests to which he submitted her. Instead of asking details of the witness, counsel was content to ask merely for the witness's ipse dixit that Mrs. Masters was a feeble-minded individual. Her mental age (M. A.), he said, was ten years and four months, her intelligence quotient (I. Q.) 64.
The witness, upon direct examination, admitted that Mrs. Masters "seemed to respond quite well" to the tests, and he admitted further, on cross-examination, that while she was on the witness stand she "did a creditable job on multiplication tables," and that she corrected counsel when he made a mistake in questioning her. When asked, "How many witnesses did you ever hear on the witness stand that made a better witness and answered the questions more intelligently than she did," Mr. Odoroff replied, "That is a question, of course, I cannot answer." In fact the witness declined to take into consideration, in expressing his conclusions, her testimony from and her demeanor upon the witness stand.
The executive secretary of the welfare board testified of the conditions she found on her routine visits to the Masters home, the condition of the children, and the complaints as to their nonattendance at school. She was not asked her opinion on the question of Mrs. Masters' mental capacity.
The "boarding-mother" with whom the baby was placed testified as to the general condition of the Masters home and as to the improvement in the health and general condition of the child after taken into her home.
We have no desire to change the rule that proceedings of this nature are not adversary in nature, that they are conducted by the state in its character of parens patriae, and that "the manner and method of determining the facts, when jurisdiction has once vested *Page 561 
in the court as required by law, rests in its sound judgment and discretion, controlled of course by the general rules of judicial procedure." Prokosch v. Brust, 128 Minn. 324, 327,151 N.W. 130, 132; Hanson v. Kalstarud, 114 Minn. 489,131 N.W. 477; Wood v. Wood, 137 Minn. 252, 163 N.W. 297; In re Guardianship of Buck, 171 Minn. 227, 213 N.W. 898; In re Guardianship of Dahmen, 192 Minn. 407, 256 N.W. 891; State Board of Control v. Fechner, 192 Minn. 412, 256 N.W. 662; In re Guardianship of Strom, 205 Minn. 399, 402, 286 N.W. 245,247; note, 91 A.L.R. 96. This rule, announced in proceedings involving the appointment of a guardian for an alleged incompetent, applies with equal force to proceedings for the commitment of a feeble-minded person to a state institution. As said in the Strom case, 205 Minn. 402, 286 N.W. 247:
"With the trial court necessarily rested the primary responsibility of determining fact issues. We are and should be guided by the fact that much must necessarily be left, especially in proceedings of this kind, to the sound judgment and discretion of the trial court. It has the advantage, not possessed here, of being confronted with the witnesses, the alleged incompetent person, and the circumstances surrounding the entire proceeding. It is more capable than we of reaching a clear understanding of the situation and of the mental condition and capacity of the claimed incompetent person."
Notwithstanding our somewhat critical analysis of the entire proceedings below, we would not disturb the result if the trial court had applied the correct rule as to quantum of proof in proceedings of this kind. The case is not here de novo, as it was in the district court. Minn. St. 1941, § 525.79 (Mason St. 1940 Supp. § 8992-184). On the contrary, our sole function in weighing evidence in proceedings of this nature is to determine whether there is any evidence reasonably tending to sustain the trial court's finding. If there is such evidence, this court cannot disturb or reject the findings, although there may be evidence to the contrary. Hanson v. Kalstarud, 114 Minn. 489,131 N.W. 477; State Board of Control *Page 562 
v. Fechner, 192 Minn. 412, 256 N.W. 662, supra; and see Dittrich v. Ubl, 216 Minn. 396, 13 N.W.2d 384.
3. The record here, however, affirmatively discloses that in arriving at its findings and conclusions the trial court placed too great a burden of proof upon the petitioners. In its memorandum attached to the findings, the court cited 32 C. J., Insane Persons, § 325, to the effect that "the proof must be clear and satisfactory." Although this be the rule in Maryland and New Jersey as announced in decisions of their courts cited in support of the Corpus Juris text, we decline to adopt it. Human liberty is too precious, the family home too fundamental, and mother love too sacred to put such an onus upon a mother seeking judicially to establish her mental capacity so that she may return to her home, her children, her neighborhood, and everything that is dear to her. That she should assume the burden of proof to establish her restoration to capacity is perfectly proper, for the law rightfully presumes that a condition of feeble-mindedness or insanity once shown to exist will thereafter continue. We recognize that in committing the less fortunate members of society to our public institutions the courts are not penalizing them; yet a proper respect for our fundamental American concepts of liberty and freedom impels us to hold that these unfortunates have met the full measure of proof entitling them to a decree of restoration to capacity when they prove their present mental capacity by a fair preponderance of the evidence. The interests of society will be amply protected by merely shifting the burden of proof to the one who petitions for a decree of restoration without also requiring his or her proof to be "clear and satisfactory."
4. Our statutes do not define "feeble-mindedness," nor has this court announced any hard and fast tests for determining the existence vel non of such condition. Neither have we found a comprehensive definition of the term in the decisions of other courts. See 16 Wd. Phr. (Perm. ed.) "Feeble-Mindedness," p. 304.
We have been referred by the attorney general to a recent text, "Clinical Psychology," by C.M. Louttit, Director, Indiana University *Page 563 
Psychological Clinics, for a definition of the condition. As that author points out (p. 95), "there is no universally accepted concept of what the condition is," due mainly to the fact that "the feeble-minded may be regarded from at least four points of view — medical, sociological, pedagogical and psychological — and unfortunately the criteria based upon each of these do not always coincide."
Absent any statutory definition, we feel justified, however, in accepting the following sociolegal definition of "feeble-mindedness" proposed by the British Mental Deficiency Committee (Wood, 1929), set forth by Louttit in his work, at p. 96:
"* * * a condition of incomplete development of mind of such a degree or kind as to render the individual incapable of adjusting himself to his social environment in a reasonably efficient and harmonious manner and to necessitate external care, supervision or control."
Louttit also points out (p. 97):
"The social criteria are variable, but this is at once their weakness and their strength. A weakness because it suggests arbitrariness, and makes the feeble-minded condition depend on the contingencies of the moment. From a scientific or technical point of view this is, perhaps, undesirable. * * * It is, however, just this sort of definition that is most useful in clinical work. It seems hardly justifiable to call a man feeble-minded because of low test performance or poor school attainment when he is successfully adjusting to the economic and social environment. Diagnosis which carefully considers this social criterion recognizes that adequate social adjustment at the present time is no guarantee that such adjustment will continue."
To which we add, as applicable to the case here on appeal, that inadequate social adjustment at one time is not conclusive that such maladjustment will continue indefinitely. Hence, feeble-mindedness, viewed from a sociolegal rather than a purely medical *Page 564 
standpoint, is not necessarily a "permanent" and "incurable" condition, as stated by the trial court in its memorandum.
In the case of Mrs. Masters there is persuasive proof in her intelligent responses to examination and cross-examination in the court below that, having been given the chance of complete physical and emotional convalescence at the state institution for more than a year, her condition has definitely improved. She has become rehabilitated in some degree at least. Even the psychological tests show definite and substantial improvement both in her I. Q. and her M. A. Whether this improvement is such as to remove her from the "feeble-minded" category and obviate the necessity for further institutional care is a question we are willing to resubmit to the court below in the light of the definition we have approved.
Psychological definitions, phrased in terms of Mental Age and Intelligence Quotient, are too arbitrary to be applied in cases of this character. Hard and fast divisions between groups on the basis of these tests cannot and should not be made. Even top-ranking psychologists do not agree on the respective M. A. and I. Q. ranges of idiocy, imbecility, moronity, and subcultural normals. The statement frequently made that all persons with I. Q.'s below 70 are feeble-minded is not justified, either from the scientific or a practical point of view. Intelligence is made up of too many factors to permit of such a dogmatic statement. Intelligence tests are not substitutes for insight and common sense, as witness a survey by reputed experts, using these tests, who make the startling disclosure that in one Minnesota county the percentage of feebleminded persons is higher than six percent. Anderson (1922), Methods and Results of Mental Surveys, 6 Journal Applied Psychology, 1, cited by Louttit at p. 99.
Most intelligence tests are made up of a battery of quizzes in vocabulary, number facility, mathematical reasoning, etc. They are, basically, tests of ability to work through abstract thought with verbal and mathematical symbols. The tests make no attempt to evaluate such admittedly important attributes as personality or moral character, but are concerned only with the abstract aspects *Page 565 
of thinking and reasoning. But intelligence, by the generally accepted definition, is the ability to meet and solve new problems, and many factors besides brain power enter into that. Interest in the task, persistence, accuracy, ability to make adjustments, even physical endurance — each may make its own contribution.
Properly administered by a skilled and experienced psychologist, these tests are the most dependable and revealing of any now available, but they may be highly misleading in the hands of nonexperts or amateurs. The results of even the best tests vary in individual cases, depending upon the time and place of the test, the physical condition and emotional stability of the testee, and other factors.
There are no means at present available for testing to a certainty the condition of feeble-mindedness in that large percentage of cases whose intellectual level is within the range where it may partially but not wholly condition successful adjustment. While psychological tests are convenient tools for indicating mental retardation, test results alone should ordinarily not be considered sufficient, must less conclusive, except at the lower levels.[2] "At higher levels," as suggested by Louttit (p. 100), "diagnosis must consider not only psychological test performance but also educational and social adaptation." He concludes that in borderline cases (p. 101), with mental ages from 8 or 9 to 11 or 12 and with I. Q.'s from 60 to 70, "the final diagnosis of feeble-mindedness * * * must rest on their social history."
Petitioners' case was on the border line — hence the necessity of applying not only the correct test to determine her feeble-mindedness but also of applying the correct rules as to the burden and quantum of proof. Had the trial court used the tests we adopt as the proper ones rather than to consider feeble-mindedness as "incurable," *Page 566 
and had it required only a preponderance of evidence on the issue instead of "clear and satisfactory" proof, its ultimate conclusion might have been different.
The proper disposition of Mrs. Masters' children will, of course, be only incidentally affected should she ultimately be restored to capacity. Such restoration would not entitle her to their custody as of right. In appropriate proceedings, they have been declared "neglected" children and made wards of the state. Their welfare, and not their mother's, is supreme in determining who shall have their custody.
Because of the errors indicated, there must be a new trial.
Reversed.
[2] For those who desire to pursue this interesting subject further, this bibliography is offered by the University of Minnesota: Pintner, Rudolph (2 ed.) Intelligence Testing:Methods and Results, Henry Holt, 1931, Pp. xiii+555; Terman, L. M. and Merril, M. A., Measuring Intelligence (1937), Houghton-Mifflin, Pp. xii+461; National Society for the Study of Education, Thirty-Ninth Yearbook, Intelligence: Its Natureand Nurture (1940), Public School Publishing Co., Bloomington, Ill., Pp. xviii+409, and xviii+471.