IN RE ESTATE OF HENRY HARTZ.
ELIZABETH CADE AND OTHERS v. ANNA HOFF, ALSO
KNOWN AS ANNA HUFF, AND ANOTHER.[1]

July 18, 1952.

No. 35,786.

[1]Reported in 54 N. W. (2d) 784.

*Foley & Foley* and *Harry H. Peterson,* for appellants.
*Clifford W. Gardner,* for respondents.

MATSON, JUSTICE.

Appeal in a will contest from an order denying contestants' motion for a new trial.

Henry Hartz, a resident of the village of Mazeppa, Minnesota, died in the Lake City Hospital on December 31, 1950, at the age of 81 years. He had never married. His closest relatives were

four first cousins residing in Oklahoma who, as appellants herein, contest his last will on the ground of undue influence. By his will, which was executed on December 1, 1950, or 30 days before he died, he bequeathed and devised his estate of approximately $96,000 as follows: A total of $7,000 to his church and its cemetery; $3,000 to Father Flannagan's School for Boys; $1,000 to each of the contestants, his first cousins; $500 to each of seven second cousins; and the entire residue to Anna Hoff, who was not related to him but who had worked and cared for him since November 8, 1949, or for slightly more than one year prior to his death. The will contains an incontestability clause, which provides that any bequest to a person who contests the will shall be void. Testator designated Vincent Sand, cashier of the bank at Mazeppa, as executor.

The probate court allowed the will in its entirety, and upon appeal to the district court the order of allowance was affirmed. Appeal is now taken from the district court's order denying contestants' motion for amended findings or a new trial. Contestants, appellants herein, assert that the provisions of the will bequeathing only $1,000 to each of them and the bulk of the estate to Anna Hoff, and also the incontestability clause and the provision for the appointment of Vincent Sand as executor, are all invalid as having been procured through the undue influence of Anna Hoff. The rest of the will, contestants assert, was not tainted with undue influence and is valid.

Henry Hartz and his brother Nick, both bachelors, operated a farm together for many years near Mazeppa. Nick handled most of their business. In 1935, Henry and his brother retired from the farm and moved to the village of Mazeppa, where they lived alone until Nick's death on October 16, 1949. After Nick's death, Henry was taken on a visit to his cousins in Oklahoma, some of whom are the contestants herein, for a couple of weeks. There is testimony—which is in sharp conflict with other testimony—that he was not well treated by contestants while in Oklahoma, and that they took him back to Mazeppa, where he was left alone and

unattended in his residence until three days later, when Anna Hoff commenced to take care of him.

Anna Hoff went to work for Henry on November 8, 1949. The evidence is in dispute as to whether she started to work for Henry without being asked or whether Henry asked her to work for him. Henry paid her $10 per week for her services, and she continued in his employ until his death.

At the time Anna commenced working for Henry, she was 65 years old, single, and had lived in Mazeppa all her life. She had two years of college education and had taught school for 18 years. She had known the Hartz family for 50 years, and at one time lived in their home for one term while teaching school. She had other connections with the Hartz family. Henry's sister had kept house for Anna's mother for many years, and Anna and her mother visited the Hartz home about once a year. Anna helped her mother run a hardware store and later operated a secondhand shop of her own. She had a personal checking account in the bank where Vincent Sand was the cashier.

Henry was 80 years old when Anna started working for him. He was then suffering from hardening of the arteries, dropsy, a severe hernia, high blood pressure at times, and a miocardiac condition. He was sent to the hospital on three different occasions while Anna was working for him. The first time was from February 24, 1950, to April 13, 1950; the second time, from November 10, 1950, to November 24, 1950; the third time, from December 30, 1950, to the time of his death on the following day.

Henry's will was prepared by Robert R. Dunlap, an attorney, and was executed on December 1, 1950. Prior thereto, Dunlap had been acquainted with both Henry and Nick and had done some legal work for them in 1949. He had also acted as attorney for the administrator of Nick's estate. He was first consulted by Henry with regard to a will in the spring of 1950, and thereafter he and Henry discussed the provisions of the contemplated will on about a dozen different occasions. The evidence indicates that Dunlap had never discussed the provisions of the will with any person

other than Henry and his own secretary, to whom the will was dictated. From the time of the first discussions in regard to the will, Henry stated that he was going to leave most of his property to Anna because she had been good to him and had taken care of him, and because the cousins had never done anything for him and, when he needed help, had been of no assistance. The will was drafted according to Henry's instructions.

The will was executed in the kitchen of Henry's residence. Dr. Robert N. Bowers, his personal physician, and Vincent Sand, the bank cashier, were called to the residence to act as witnesses. Prior thereto on the same day, Dr. Bowers had given Henry a physical examination. At the time of the actual signing, Anna stood in a doorway some 12 feet away. The will was not read to the witnesses, and there is no evidence that any person other than Dunlap and Henry Hartz knew its contents until after Henry's death, although there is some testimony that Anna had a receipt for the will. This she denied.

We are concerned with these issues:

(1) Were contestants erroneously limited in their proof to direct evidence?

(2) Was the opinion of a layman as to whether testator was easily subject to undue influence erroneously excluded?

(3) If a litigant introduces into evidence letters of one party to a correspondence series, may the court receive into evidence the replies which tend to explain such letters?

(4) Should the extrajudicial statements of the principal beneficiary have been received not merely for impeachment purposes but as substantive evidence?

■ A careful examination of the record shows that the trial court did not limit contestants in their proof to direct evidence. In the course of the trial the court said:

"* * * I know what the application is so far as laying the foundation of undue influence. That it must be affirmative, and

it must have operated to the extent of becoming the act in place of that of the testator."

Again the trial court said:

"* * * Undue influence unless it becomes an affirmative act, the mere fact that an opening [opportunity] may have existed or suspicion that it did exist, doesn't establish it." (Parenthetical matter supplied.)

Clearly, the trial court meant nothing more than that the undue influence must have actually or affirmatively operated upon the testator so that the making of the will was not his act. The trial court's language cannot be construed at any point to mean that it ruled that proof of undue influence must be established by direct evidence to the exclusion of circumstantial evidence. Even if the trial court had used the words "affirmative proof," no error would have resulted, because it must be borne in mind that the term "affirmative proof" means such evidence as will establish the fact or matter in dispute by a preponderance of the evidence without regard to whether the evidence is direct or circumstantial.[2]

■ It was not error to refuse to permit Lena Hofschulte to give her opinion as to whether Henry could be easily influenced. A layman, as a nonexpert witness, may give an opinion as to the mental capacity or condition of a testator's mind, but only if a proper foundation has first been laid by showing that such layman had the opportunity to observe and did observe the testator's mental characteristics and habits at such times, with respect to such facts, and under such circumstances as enabled her to form a reasonably reliable and trustworthy opinion as to testator's mental condition.[3] Whether a sufficient foundation has been laid as a

[2]Boardman v. Lorentzen, 155 Wis. 566, 145 N. W. 750, 52 L.R.A.(N.S.) 476 (undue influence case); Jenkins v. Hawkeye Commercial Men's Assn. 147 Iowa 113, 124 N. W. 199, 30 L.R.A.(N.S.) 1181; Glass v. Newport Clothing Co. Inc. 110 Vt. 368, 8 A. (2d) 651; Black's Law Dictionary (4 ed.) p. 82.

[3]See, Sullivan v. Brown, 225 Minn. 524, 31 N. W. (2d) 439; In re Restoration to Capacity of Masters, 216 Minn. 553, 13 N. W. (2d) 487, 158

basis for a nonexpert opinion as to mental capacity rests in the sound discretion of the trial court. As applied to the instant case, the facts are as follows: Lena had known Henry all her life. After Henry and his brother Nick moved to Mazeppa, she visited with them several times a week. In June 1950, however, she went to work in a canning factory and did not see Henry again until November 25, 1950, at which time she saw him for only about 15 minutes. She was asked by her attorney whether, based on her long acquaintance with Henry and her knowledge of him during the many years she had known him and her observation of him on November 25, 1950, she considered that at the time he was a man who could be easily influenced. Respondents' objection to this question was sustained. The trial court could justifiably conclude that a 15-minute observation after not having seen Henry for five months, even though she had seen him often prior to that time, was not a sufficient observation to enable her to draw a reasonably reliable conclusion as to Henry's mental capacity to make a will on December 1, 1950.

Shortly after beginning to work for Henry, Anna commenced a correspondence with Leo S. Cade, a second cousin of Henry's and a legatee in his will. In her letters she said, among other things, that Henry was a helpless, sick, and forgetful man who was an easy prey for the wolves; that he was pushed around by one of the contestants; that if he were fed a little flattery one could wind him around one's thumb; that she handled all his business and all his money, but that she took all necessary papers to him to show and explain to him what she had done; that he never questioned her as to what she had done; and that she thought it was best for him to dispose of his farm, but that she kept out of the deal. These letters were introduced in evidence by contestants, whereupon the court, over contestants' objections, permitted the proponents of the will to introduce in evidence the answering letters of Leo S. Cade as an aid in explaining Anna's letters. There was no error. If a litigant relies upon and introduces in evidence letters of one party to a

A. L. R. 1210; Bird v. Johnson, 199 Minn. 252, 272 N. W. 168; 2 Dunnell, Dig. & Supp. § 3316; 20 Am. Jur., Evidence, § 773.

correspondence series, the replies of an answering correspondent, which tend to explain such letters and are an aid to their proper interpretation, are admissible in evidence.[4] The theory behind this rule is that if a party is to be judged or affected by a letter or letters received in evidence the whole of the correspondence on the subject should be received, for the same reason that a whole conversation is allowed in evidence under like circumstances.

■ Certain extrajudicial statements of Anna Hoff were received in evidence for impeachment purposes only and apparently were not considered as substantive evidence. This was error, and such error may have controlled the findings of the trial court. As an exception to the hearsay rule,[5] it is generally held that inconsistent declarations or admissions of a person who is both a witness and a party to the issue to be tried, made in or out of court, irrespective of whether they are against the declarant's interest, are binding upon the declarant and are admissible in evidence not only for impeachment purposes, but also as substantive evidence or proof of the facts therein stated.[6] According to the majority of courts[7]— inclusive of Minnesota—this general rule, with certain qualifications, is subject to the exception that in proceedings to contest the validity of a will on the ground of mental incapacity or undue influence, where there are two or more beneficiaries *whose interests under the will are several and not joint,* the inconsistent extra-

[4]Lester v. Sutton, 7 Mich. 329; 3 Jones, Commentaries on Evidence (2 ed.) § 1067; 7 Wigmore, Evidence (3 ed.) §§ 2104, 2120; see, Garbisch v. American Ry. Exp. Co. 177 Minn. 494, 225 N. W. 432; 2 Dunnell, Dig. & Supp. § 3237.

[5]See, Edmund M. Morgan, *Admissions as an Exception to the Hearsay Rule,* 30 Yale L. J. 355; 4 Wigmore, Evidence (3 ed.) §§ 1048, 1081, and footnote 10, *infra.*

[6]Williams v. Jayne, 210 Minn. 594, 299 N. W. 853; 2 Dunnell, Dig. & Supp. § 3409.

[7]For minority rule, which undoubtedly is sounder on principle, see Annotation, 167 A. L. R. 49 to 52; 4 Wigmore, Evidence (3 ed.) § 1081(2). Contra, see 2 Jones, Commentaries on Evidence (2 ed.) § 941, p. 1735.

judicial declarations or admissions of one beneficiary[8] are inadmissible as substantive evidence if they are prejudicial—not merely in a technical sense—to the interest of cobeneficiaries.[9] Stated more fully in the converse, and *in the light of its qualifications,* the majority rule is that, as an exception to the hearsay rule,[10] the inconsistent extrajudicial declarations or admissions of a beneficiary as to testamentary capacity or undue influence—irrespective of whether they are against the declarant's interest[11]—are admissible in evidence not merely as impeaching testimony but as substantive proof of the facts stated therein if:

[8]As to whether declarant and other beneficiaries must be parties to the record, see Annotation, 167 A. L. R. 74 to 78.

[9]In re Estate of Olson, 227 Minn. 289, 35 N. W. (2d) 439; In re Estate of Knutson, 144 Minn. 111, 174 N. W. 617; McAllister v. Rowland, 124 Minn. 27, 144 N. W. 412, Ann. Cas. 1915B, 1006.

[10]Wholly independent of any exception to the hearsay rule, inconsistent declarations of a beneficiary made prior to the execution of the will have been held admissible as original evidence when such declarations indicate the existence of a design or plan by the beneficiary to use undue influence, and also when such declarations are offered to show declarant's state of mind, affection, or relationship between him and the testator. See, 57 Am. Jur., Wills, § 422; Annotation, 167 A. L. R. 23 to 25. There is a split of authority as to whether the admissibility of inconsistent declarations on this basis is governed by the same restrictions as those which apply when they are offered in evidence as an exception to the hearsay rule. See, Annotation, 167 A. L. R. 26 to 28. In the light of our decision herein, no consideration need be given to the problem.

[11]2 Jones, Commentaries on Evidence (2 ed.) § 898, p. 1646; 4 Wigmore, Evidence (3 ed.) § 1048(3, 4); Edmund M. Morgan, *Admissions as an Exception to the Hearsay Rule,* 30 Yale L. J. 355, 359, 360. This court has spoken of them as admissions against interest in McAllister v. Rowland, 124 Minn. 27, 34, 144 N. W. 412, 414, Ann. Cas. 1915B, 1006, and In re Estate of Knutson, 144 Minn. 111, 116, 174 N. W. 617, 619. Cf. however, Williams v. Jayne, 210 Minn. 594, 597, 299 N. W. 853, 854. Although an inconsistent declaration need not be against declarant's interest to be admissible, the fact that it is when made may add to its probative value. 4 Wigmore, Evidence (3 ed.) § 1048(4).

(a) The declarant is the sole beneficiary[12]; or

(b) If the declarant is the only proponent of the will, the other beneficiaries being contestants or merely nominal beneficiaries or persons who would not suffer by the rejection of the will[13]; or

(c) If the cobeneficiaries have authorized, concurred in, or assented to declarant's declarations or admissions[14]; or

(d) If the declarant has a joint interest[15] with all other beneficiaries who will be adversely affected—not merely adverse in a technical sense[16]—if the will be adjudged invalid; or

(e) If, in undue influence cases,[17] it can be ascertained that the undue influence vitiates only a part of the will and the part so vitiated is separable and may be deleted without affecting the remaining provisions of the will which, in spite of the deletion, remain intelligible and complete and can be carried into effect *without destroying the testator's wishes* as evidenced by a connected and general scheme of distribution, and *without causing manifest injustice* to one or more of the beneficiaries.[18] Of course, if it is im-

---

[12]See, Annotation, 167 A. L. R. 35, 36, 61. It is submitted that where all beneficiaries made *similar* inconsistent declarations or admissions tending to the same effect or conclusion, they should likewise be admissible, but see Annotation, 167 A. L. R. 62, 63; 57 Am. Jur., Wills, § 429.

[13]Annotation, 167 A. L. R. 60, 61, 64, 65; 57 Am. Jur., Wills, §§ 426, 427.

[14]Annotation, 167 A. L. R. 61; see footnote 12, *supra.*

[15]57 Am. Jur., Wills, § 424; Annotation, 167 A. L. R. 37 to 47, 61, 62. As to meaning of joint interest concept, see 57 Am. Jur., Wills, § 424, and Annotation, 167 A. L. R. 46, 47. As to interest of executors, spouses of beneficiaries, or successors in interest, see Annotation, 167 A. L. R. 35 to 37.

[16]See, McMann v. Murphy, 259 Mass. 397, 156 N. E. 680; Annotation, 167 A. L. R. 64, 65.

[17]As to whether there may ever be partial invalidity of a will for want of testamentary capacity, see Annotation, 69 A. L. R. 1134; 57 Am. Jur., Wills, § 38.

[18]Carothers's Estate, 300 Pa. 185, 150 A. 585, 69 A. L. R. 1127, with Annotation at p. 1129; Millikin Nat. Bank v. Wilson, 343 Ill. 55, 174 N. E. 857, 75 A. L. R. 117; 1 Page, Wills, § 193, and cases therein cited; 57 Am. Jur., Wills, § 38; In re Estate of Ankeny, 238 Iowa 754, 28 N. W. (2d) 414; In re Estate of Koller, 116 Neb. 764, 219 N. W. 4. See, Woodville v.

possible to determine what specific legacies have been tainted with undue influence, the whole will is void.

"* * * If there is a connected and inseparable scheme of disposition of the estate, each part of which is so connected with the others that they are interdependent, and the presumed intention of the testator would be defeated if one portion were retained and other portions rejected, or if manifest injustice would result from such construction to one or more of the beneficiaries, then all the provisions must be construed together and all must be held illegal." Millikin Nat. Bank v. Wilson, 343 Ill. 55, 65, 174 N. E. 857, 861, 75 A. L. R. 117.

As applied to the instant case, the extrajudicial declarations or admissions of Anna Hoff were admissible as substantive evidence, in that, if undue influence were to be established, it might be ascertained that it vitiated only the provisions for declarant and the contestants, and that these provisions may be separated from the remainder of the will without destroying any general scheme of distribution. No connected and inseparable plan of distribution ties the former provision to the latter. The remaining provisions are intelligible and complete in themselves and can be put into effect alone without destroying testator's wishes and without doing injustice to any beneficiary.

■ Although upon the record as it now stands the evidence sustains the findings, it is not the function of this court, as a court of review, where the evidence is in conflict, as here, to determine what effect, if any, the extrajudicial statements of Anna Hoff will have upon the findings when they are considered by the trier of fact as substantive evidence and not merely for impeachment purposes. It will not be necessary, however, to have a new trial. As was appropriately said by this court in In re Estate of Olson, 227 Minn. 289, 302, 35 N. W. (2d) 439, 447:

---

Morrill, 130 Minn. 92, 153 N. W. 131; 1 Mason's Dunnell, Minn. Probate Law, § 173.

"The record shows that the parties have explored the factual situation exhaustively and that there is no likelihood of a new trial developing additional evidence. In such a situation, an entire new trial is neither necessary nor advisable. Where in a case tried by the court without a jury the trial court errs as to the rule of law to be applied in considering the evidence in making its findings, the appellate court should vacate the findings made and remand the case with directions to reconsider the entire record and make new findings in the light of the applicable rule of law. * * * This is especially true where, as here, an appeal is in the nature of a writ of error. * * * The fact-finding function in such cases is in the trial court. In a case such as this, where the weight of the evidence depends in large measure upon the appearance and interest of the witnesses, the trial court is peculiarly qualified to discharge the fact-finding function, and the appellate court is not."

Reversed and remanded for vacation of findings and for a reconsideration of the record and the making of new findings in accordance with this opinion.

Reversed and remanded.