STATE of Minnesota, Respondent,

v.

Fred John WALDON, Appellant.

No. 48430.

Supreme Court of Minnesota.

Dec. 21, 1979.

C. Paul Jones, Public Defender, and Gregory A. Gaut, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Paul G. Zerby, Asst. Atty. Gen., and Barbara D. Gill, Sp. Asst. Atty. Gen., St. Paul, Elton A. Kuderer, County Atty., Fairmont, for respondent.

Heard before OTIS, PETERSON and KENNEDY, JJ., and considered and decided by the court en banc.

OTIS, Justice.

On a plea of guilty, appellant Fred John Waldon convicted on September 22, 1975, of attempted aggravated rape in violation of Minn.Stat. §§ 609.17, .291 (1974). The district court thereupon committed him for a presentence examination by the commissioner of public welfare who recommended that he undergo specialized treatment for his "mental and physical aberrations." Pursuant to Minn.Stat. § 246.43, subd. 6 (1978), he was accordingly committed to the

security unit of the St. Peter State Hospital on November 24, 1975.[1]

However, the trial court failed either to specify the term of the sentence or to indicate that it was according to law, the maximum term being fifteen years under Minn. Stat. § 609.17, subd. 4(2) (1978).

On August 2, 1977, the commissioner advised the trial court that he was entering an order continuing appellant's commitment for the maximum period provided by statute, stating that "it appears that he will require further care and treatment for some time in the future." A review by the court of this order was requested by the commissioner. On November 7, 1977, the trial court responded by authorizing an examination of appellant and report by an independent psychiatrist, Dr. William Chalgren of Mankato.

Upon receiving that report, the trial court conducted a hearing on November 21, 1977, following which the court entered an order on November 23, 1977, finding that "discharge of the defendant from the control of the Commissioner would be dangerous to the public because of the defendant's mental disorder or abnormality." The court confirmed the commissioner's decision to retain control of appellant "beyond the minimum term provided by statute." It is from that order of the district court the defendant appeals. Consequently, we confine our consideration and decision to the narrow questions of whether appellant was denied due process of law at that hearing; if not, whether the evidence supports the court's findings; and whether his present confinement in prison confers on him the benefits enjoyed by other prisoners. We decline to rule on the broader issues raised by appellant which attack the validity of the initial commitment to the commissioner of public welfare.[2] No appeal was taken from those proceedings and in view of the repeal of Minn.Stat. § 246.43 (1978), our conclusions would have little precedential value.

By the terms of Minn.Stat. § 246.43, subds. 11 and 12 (1978), the commissioner must retain any person committed to him as a sex offender as long as supervision and control are "necessary for the protection of the public," but unless the court orders otherwise, not longer than the maximum sentence. The commissioner may not release the offender sooner than two years after sentencing without the approval of the court. Subdivision 13 permits the commissioner to order an offender to remain subject to his control *beyond* the expiration of the sentence if in his opinion a discharge would be dangerous to the public because of deficiency, disorder or abnormality. That order must be reviewed by the committing court within ninety days. Under subdivision 14, if the court finds the offender's discharge would not be dangerous to the public, the commissioner must release him. Otherwise subdivision 15 requires the commissioner every five years to seek court confirmation of his continuing control over the offender.

The appellant is not yet being retained under the control of the commissioner beyond the expiration of his sentence. Therefore, we do not find it necessary at this time to scrutinize the due process aspects of his continued confinement, if any, after that date.

Because two years have now elapsed since the time of the hearing which is here for review, and in the interim appellant has

---

1. Minn.Stat. § 246.43, subd. 6 (1978), before its repeal, provided:

   If it appears from said report that the commissioner recommends specialized treatment for his mental and physical aberrations, the court may either place him on probation with the requirement as a condition of such probation, that he receive outpatient treatment in such manner as the court shall prescribe, or commit him to the commissioner under this section.

It was repealed by 1978 Minn.Laws ch. 723, art. I, §§ 19, 20, and by 1979 Minn.Laws ch. 258, §§ 25, 26. Section 25 provides:

   The sections hereby repealed shall continue to be applicable to any person with respect to acts committed prior to the effective date of this subdivision.

2. See *Huebner v. State*, 33 Wis.2d 505, 147 N.W.2d 646 (1967); *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).

been transferred to the state prison, he is no longer under the ongoing supervision of the commissioner of public welfare but nevertheless remains under the commissioner's control. We find this an anomalous and troublesome gap in responsibility which may result in denying appellant both the benefits of a patient and those of a prisoner. Notwithstanding the commissioner's statutory authority to transfer an offender "to or from any institution to provide for him according to his needs and to protect the public," Minn.Stat. § 246.43, subd. 8 (1978), where the offender is no longer receiving treatment in the security hospital, equal protection of the laws may well require that he be accorded the rights of other prisoners who are also confined in the state prison and are no more dangerous to the public than appellant. These rights include, among others, credit for good behavior and the use of the matrix system for determining eligibility for parole. If these benefits are to be denied appellant after treatment is discontinued, and he is confined in a penal rather than a medical facility, it is of critical importance that the hearing authorized by Minn.Stat. § 246.43, subds. 13, 14, 15 (1978), be conducted with scrupulous attention to traditional due process considerations. *State ex rel. Terry v. Schubert,* 74 Wis.2d 487, 247 N.W.2d 109 (1976).

With these principles in mind we find the procedures followed at appellant's hearing on November 21, 1977, deficient in several particulars, recognizing, as we must, however, that appropriate objections were not always timely made.

The report of Dr. William Chalgren, requested by appellant after being examined by the doctor, describes appellant as a sociopathic personality with a longstanding personality disturbance, who has made progress while at the hospital. The doctor renders no opinion as to whether appellant's release would pose a danger to the public and simply concludes he has "no reason to question [the staff's] judgment with respect to Mr. Waldon at this time." The effect of the report was to furnish the court with no independent appraisal of appellant's prognosis.

It is not clear on which party the trial court imposed the burden of proof. For example, both the November 23, 1977, and November 16, 1977, court orders refer to the hearing as being "on Dr. Chalgren's report." The appellant was directed to proceed with his evidence first, which we agree does not necessarily indicate the court's view in the matter. Nevertheless we are left in doubt as to how the court weighed the evidence in reliance on what it may have believed to be a decisive procedural obligation on one party or the other. We are of the opinion that the better rule leaves the burden of proof where it started, that is to say, with the state.[3] Under the facts of this case, such a rule does not necessarily conflict with our decisions in *In re Masters,* 216 Minn. 553, 562, 13 N.W.2d 487, 492 (1944) and *Lausche v. Commissioner of Public Welfare,* 302 Minn. 65, 70, 225 N.W.2d 366, 369 (1974).

Here, it should be kept in mind, there was never an adversary hearing on the question of whether or not appellant was "a danger to the public" until November 21, 1977. When he pled guilty in September 1975 he was granted no opportunity to resist specialized treatment under the jurisdiction of the commissioner of public welfare. The statute authorized no such hearing. It was not necessary that the sentencing court find appellant "a danger to the public" in order to commit him to the commissioner. It was only necessary that the commissioner recommend him for specialized treatment "for his mental and physical aberrations." Accordingly, the November 21, 1977, hearing was the first time the issue of "dangerousness" was litigated, and in view of its decisive effect on appellant's right to release, the trial court's understanding of where the burden of proof lay should not remain a matter of conjecture.

3. *See State v. Smith,* 55 Wis.2d 451, 198 N.W.2d 588 (1972); *State v. Torpy,* 52 Wis.2d 101, 187 N.W.2d 858 (1971).

**632**

At the November 21, 1977 hearing the appellant himself testified and produced as his witnesses, Thomas R. O'Shea, a group counselor; Michael Scholl, a non-professional employee; Jean Hotinger, a registered nurse; and appellant's mother. The thrust of their testimony was that appellant had made numerous authorized visits away from the hospital without incident. On behalf of the commissioner, Dr. Charles Sheppard, the medical director of the security hospital, was of the opinion that appellant was dangerous. He based his conclusions on the report of a psychologist, Lynn Pengelly, rather than on personal observations. Ms. Pengelly was not called as a witness by either party nor was her report received in evidence.

Mr. Richard Seely, director of the sex offender treatment unit, and Mr. Bruce Beltt, chief psychologist, also expressed their opinions that appellant was dangerous and needed further treatment, based on reports not received in evidence. Although we do not have copies of the reports since they are not a part of the record, apparently only Ms. Pengelly described appellant as dangerous. The other state witnesses described appellant's behavior as manipulative, predatory, defiant, unpredictable, and impulsive. Without a more complete record of his reasoning in reaching his professional conclusion that appellant should be retained for further treatment, we find somewhat disturbing Dr. Sheppard's strong reliance on an episode which to a layman seems trivial. On April 4, 1977, without permission, a female staff member voluntarily drove appellant in her automobile off the premises for a period of forty-five minutes. Nothing untoward occurred during that interval of time. Nevertheless Dr. Sheppard laid great stress on the incident and so testified:

Fortunately, he didn't get involved with this girl that he took this 45 minute joy ride with back in April I believe, whenever the date was, but that to me was an indication that he couldn't be trusted. He has a long list of misbehaviors going back for a good many years. We felt that this was one indication that

he couldn't be trusted yet in the community, even though he didn't do anything dangerous at that time. That's why I said earlier that he blew his chances to stay in the RAP [Resident Assistant Program] because of it.

Appellant's counsel then asked Dr. Sheppard:

Yes, but insofar as just the danger to society is concerned, do you have any other examples where he has been—any examples where he's been dangerous to some person?

to which Dr. Sheppard answered, "No, he's done well in the hospital."

Minn.Stat. § 246.43 was a statute designed to deal only with sex offenders, and only with those the commissioner of public welfare recommended for specialized treatment to correct "mental and physical aberrations." Absent such a recommendation, sex offenders are sentenced according to law which ordinarily results in commitment to the commissioner of corrections. Appellant has a long record of anti-social behavior consisting of theft by check and related offenses, but only one isolated conviction for a sex offense, serious though it be,—an unconsummated attempted aggravated rape. When the commissioner of public welfare, by his order of August 8, 1977, continued appellant's commitment to his department for the maximum period provided by statute, he had given the trial court as his reasons, that appellant "seems to be making slow progress on the sex offender unit. However, it appears that he will require further care and treatment for some time in the future." No mention was made as to whether or not appellant's discharge would be dangerous to the public.

The state concedes that under § 246.43 "a defendant can potentially be incarcerated for life," but only after a due process hearing when the term of an inmate's sentence under the criminal law has expired. That is not the present posture of this case. Nevertheless we cannot escape the conclusion that the trial court's consideration of the commissioner's order may have been

unduly perfunctory and may have given too much weight to the views of others without arriving at an independent judgment. The order confirming the commissioner's order recited no reasons for the court's decision beyond the fact that it appeared to the court that a discharge would be dangerous to the public "because of the defendant's · mental disorder or abnormality." There were no other findings and no memorandum setting forth the considerations which governed the court's decision.

As we view the statute, to retain an offender under Minn.Stat. § 246.43 (1978), it is not enough to prove simply that he is dangerous to the public, unless the commissioner can also prove that the offender is dangerous by virtue of his aggressive sexual proclivities. Because of the inadequate record before us, we are unable to examine or analyze the evidence which prompted the commissioner and the trial court to reach the conclusion that appellant should remain under the court's control. We can only infer that appellant's removal from the security hospital and his present confinement in the state prison resulted from a decision by the commissioner that specialized treatment for appellant's mental and physical aberrations have proved to be unproductive.

For the reasons we have stated, we reach the following conclusions:

1. The record before us is not adequate to support a decision that appellant was on November 23, 1977, "dangerous to the public because of [a] mental disorder, or abnormality" as those defects bear on the likelihood of his repeating his sexually aggressive and assaultive behavior if he is released. However, we do not hold that appellant is therefore entitled to be discharged.

2. If, as we have assumed, the appellant is incarcerated in the state prison because he is no longer amenable to treatment, he is entitled to all of the benefits enjoyed by prisoners committed to the commissioner of corrections, including credit for good behavior and consideration for parole based on the matrix system.

3. Appellant may elect to retry his eligibility for release and discharge under Minn. Stat. § 246.43, subds. 14, 15 (1978), in which case he is entitled to introduce whatever additional evidence of his present mental, physical, and psychological state of health he deems germane to the issue of his recovery from the aberrations for which he was committed.

The matter is therefore remanded to the district court with directions to supervise and implement the decision we here reach.