**UNTEED, Plaintiff, v. LEHMAN et, Defendants.**

Common Pleas Court, Franklin County.

No. 195105.   Decided March 29, 1957.

354

Earhart, Robertson & Savage, Thomas Lane, Columbus, for plaintiff.

Knepper, White, Richards, Miller & Roberts, John Adams, Asst. City Atty., Columbus, for defendants.

**OPINION**

By DRAPER, J.

This cause comes on before this Court on the amended petition of the plaintiff, requesting the Court to construe certain ordinances of the City of Columbus, to determine whether officials of the City of Columbus are estopped to assert any claimed violation of certain ordinances or to issue a mandatory injunction to accept the application fees tendered by the plaintiff for renewal of a rooming house permit.

The facts in this case are that the officials of the Department of Public Welfare of the State of Ohio, prior to November 1, 1952, negotiated with the plaintiff, Stella Unteed, for the establishment of a rooming house in the City of Columbus, where they could refer persons from the Columbus State School who were considered by the properly constituted medical authorities of the Columbus State School as being no longer in need of treatment or institutional care and who were considered potentially capable of resuming a place in the community after a period of adjustment. The function of such home is to provide a place half-way between the institution where such people have been confined and the public where it is hoped that eventually they would return to as responsible individuals. In other words, it is a period and a place of adjustment to social responsibility for these people who have been out of touch with the work-a-day world for many years.

Mrs. Unteed made arrangements for the lease of the premises at 1134 East Broad Street, Columbus, and made application to the Chief Building Inspector for a rooming house permit or license. On or about December 3, 1952, she was issued a temporary rooming house permit

and on January 2nd, 1953, she was issued a rooming house permit or license. In reliance upon this license, the plaintiff expended approximately $20,000 on said premises to comply with certain safety requirements, adding essential plumbing and kitchen equipment and further equipping the same with furniture and other household goods, making said premises suitable for the accommodation of approximately fifty persons. She also entered into a ten year lease.

These persons who became residents of the Broad-Ohio Home at 1134 East Broad Street, had been confined in the Columbus State School as a result, in many cases, of commitment by the Probate Court on the ground that they were mentally retarded or feeble minded. Dr. Wendall A. Butcher in his testimony testified that some of these patients had been feeble minded from birth, while others, normal at birth, at an early age gradually degenerated mentally similar to feeble mindedness and others, due to old age, had become senile, but that under observation and tests by competent people it was determined that these people were ready to be placed in a home such as 1134 East Broad Street for the purpose of their readjustment to an acceptance of their responsibilities in life and in the expectation that they may become so adjusted that they would no longer need any type of supervision and would be placed on Old Age Pension and returned to society. Dr. Butcher in his testimony also testified that most of said patients who had been transferred to 1134 E. Broad Street had improved in their I. Q. during the period of their confinement at the State School and that it was the expectation of Dr. Butcher and others that their residence at 1134 East Broad Street would eventually result in their complete discharge and return to society.

The evidence showed that a matron is employed at the 1134 East Broad Street home and that the people there receive certain medical services but that for any serious medical services they are taken to the hospital or if it is determined that they cannot adjust, they are then returned to the State School.

The testimony also showed that these residents go downtown shopping with someone, take care of their beds and washing, and the cooking, and do those things which are the common occupation of the average human being.

The City of Columbus called for examination several of these residents for the purpose of demonstrating to the Court that they were feeble-minded. The Court, after examing them with reference to their understanding of the oath and other matters, concluded that they were capable of taking the oath and testifying (except in one instance). They were all women. While many of them were somewhat confused as to the basic things which they should know, they seemed to be cognizant of where they were at the time of the examination, which was the court house; how they had come here and other little matters which would be similar to the recollection of a small child.

The City of Columbus refused to renew the rooming house license issued in 1953 and demanded that the existing use of the premises be discontinued under the provisions of the Zoning Ordinance, the pertinent portion of which is as follows:

"Sec. 47.09.1. Special permit by Board of Zoning Adjustment.

"Within the City of Columbus, no buildings or premises shall be used, and no building shall be erected which are arranged, intended to be used for any of the following specified uses, except on special permit as provided in Sec. 47.25.

"* * *

"3. Pest house, penal or correctional institution, sanitarium for the insane or feeble minded, and dog pound; * * *"

The principal question presented to this Court is whether the use of the home as it is presently being used; comes within the terms of Section 47.09.1 of the Zoning Ordinance of the City of Columbus, that is, "Is this a sanitarium for the insane or the feeble minded?". In order to determine this question, it is necessary to arrive at the reasons behind the adoption of such type of an ordinance. It is the understanding of the Court that this ordinance was adopted in 1923. (The ordinance certainly does not intend to eliminate or prevent the operation of homes for the insane or feeble minded altogether as the ordinance contains the provision that one might obtain a special permit for such purpose.) The ordinance fails to define certain terms therein used; first, of which is the term "sanitarium." The Court must, in deciding this case, arrive at some definition of this term in conformity to what Council had in mind at the time of the adoption of such ordinance. Sanitarium ordinarily implies to the average person a building with iron bars and guards, set in a large field surrounded by a high stone wall or iron fence and operated for the purpose of confing, controlling and restraining certain people who are deleterious or dangerous to the public or to themselves and who are in constant need of nursing care, psychiatry and physical care, and, where it is necessary, to have special help such as doctors and nurses for the purpose either of confining said people or attempting, through specialized means and training, to cure them of whatever mental or physical condition they might have. Ordinarily it is considered with reference to sanitariums that such institutions are established for nervous and mental conditions. This would be the definition of the man on the street.

Both the defendants and the plaintiff have included in their briefs certain dictionary definitions of "sanitarium." The Court has checked certain legal dictionaries and has found no legal definition therein and there has not come to the Court's attention any cases in Ohio.

Sanitarium—Words and Phrases, Vol. 38. City of Atlanta v. Blackman, 113 S. E. 545. Sanitarium is a health station or retreat, boardinghomes or other places where patients are kept and where medical and surgical treatment is given.

Sanitarium is hospital. Washington Fidelity Nat. Ins. Co. v. Smith, 80 S. W. 2d, 413.

Sanitarium—an institution for medical treatment—Republic Reciprocal Ins. Assn. v. Colgin Hospital and Clinic, 65 S. W. 2d, 286.

A sanitarium is a health station or retreat, an institution for the recuperation and treatment of persons suffering from physical or mental disorders.

Residence occupied by group of young men physically handicapped

by cerebral palsy to whom no medical treatment was administered on premises was not a sanitarium. Walker v. Zoning Bd. of Adjustments, 110 A. 2d, 416, Pa.

Is the home which is the subject of this controversy such a sanitarium as heretofore defined? True, there is a matron in charge of the building. It is only natural that people as elderly as these people are, would be in need of occasional medical care, but by the testimony of Doctor Butcher, these people were not put into this home for the purpose of receiving such medical or nursing care nor was the home established nor is it run as a convalescent home or a home for the purpose of caring for invalids or to attempt to cure or improve people with mental or physical diseases. Neither was there any testimony that it was operated on the same basis as a hospital and certainly there is nothing in the testimony which would bring this particular operation into the definitions either of the commonly accepted understanding that people have with reference to sanitariums or the dictionary definitions which have been cited or the court decisions cited. The Court, under the testimony, can see no difference between the medical and nursing services received by these parties and the medical and nursing services to the ordinary family, particularly the family who may have in their household elderly people. Thus, it is the conclusion of this Court that the present operation of this home is not a sanitarium as set forth in the ordinance. This is dispositive of the case as such ordinance must be construed strictly but consideration should be given to the term "feeble-minded."

The next question is: Are these people feeble-minded. Again, the ordinance is silent as to what is a feeble-minded person. Sec. 2151.24 R. C. has defined mentally deficient or feeble-minded people, and we must assume that the City Council, in adopting the ordinance since it did not define this term itself, accepted the definition as contained in the State Statute. The State Statute says that a feeble-minded person refers to any person whose intellectual development has been retarded from birth or from an early age and whose intellectual and social capacity is below normal for his chronological age to such an extent that he lacks sufficient control, judgment and discretion to manage himself and his affairs and who, by reason of such deficiency, for his own welfare or the welfare of others of the community, requires supervision, guidance, care or control.

It will be noted in this definition that all of these terms are joined by the conjunction "and," which means in the interpretation of this statute that to be feeble-minded must be one who has fulfilled the terms set forth in this statute; his intellectual development must be retarded from an early age or birth; his capacity must be below normal for his chronological age to the extent that he lacks sufficient control, judgment and discretion to manage himself and his affairs, and that it is necessary for his welfare or the welfare of others to keep him under constant supervision, guidance, care or control. The Court is not attempting to inculcate into the residents of this home a greater I. Q. than that which they show, nor is the Court attempting to say that these people are not mentally retarded, but the question is as to whether they are feeble-

minded as defined in the statute, to such an extent that they and this home would come within the Zoning Ordinance of the City of Columbus.

The Superintendent of the hospital where these people were confined, as well as other technically trained people who were in constant touch with these people and who had submitted them to all types of examination, were of the opinion that these people could adjust, after a period of time, to life and be returned to society to live on Old Age Pensions and be released from institutional care; that the only thing necessary for this to happen was that since these people had been confined for many, many years and dependent upon others for the furnishing of food and clothing, shelter, etc., they could not suddenly be turned out into the world and expected to assume a normal method of living, but that, given a little time, they would improve sufficiently to manage themselves and their affairs to the extent of being returned to society. Secondly, Dr. Butcher in his testimony as to the I. Q. of these people, showed that in practically every instance they had improved in I. Q. and both Dr. Butcher and Dr. Porterfield, when asked by this Court if these people were feeble-minded as defined in the statute, stated that they were not. They further testified that many of them were not mentally retarded from birth or from an early age; that while their intelligence and social capacity were below normal for their chronological age, yet they had, since going to the home and, under supervision and care, increased their ability to manage themselves and that under these circumstances they could not then say that they were feeble-minded as so defined.

Taubner v. Slate, 13 N. W. 2d 487:

"Feeble-mindedness" within statute providing for commitment of feeble-minded person is a condition of incomplete development of mind of such a degree or kind as to render the individual incapable of adjusting himself to his social environment in a reasonably efficient and harmonious manner and to necessitate external care, supervision or control.

Inadequate social adjustment at one time is not conclusive that such maladjustment will continue indefinitely.

Mere confinement does not show feeble-minded.

Thus we might say that under the statutory definition a party to be feeble-minded, would be unable to improve his I. Q. or mental age, would be unable to socially adjust to the world. The doctors and other experts who testified in this case all agreed that these people had shown improvement and that in their opinion would eventually be in a position to be released.

There has been no showing that the operation of this home is dangerous or inimitable to the neighborhood, or is a nuisance. Further, the purpose of this home is to keep these people close to the State School so that officials there will be able to determine if these people are making such advancements to release them or should be returned to the State School.

This Court feels that the state statute is controlling as to a definition of feeble-mindedness and that the evidence shows these people are

not within that definition; that if the City desires to control such operations, it should define what is included within terms.

In the case of Teubner v. Slate, supra, at page 492 it is held:

"There is no universally accepted concept of what the condition is" due mainly to the fact that "the feeble-minded may be regarded from at least four points of view, medical, sociological, pedagogical and psychological, and unfortunately the criteria based upon each of these do not always coincide."

The right of council to regulate for the health, safety and welfare of its citizens cannot be questioned, but such ordinances must be clear in their pronouncements and strictly construed according to its exact and technical meaning, particularly when it infringes on rights such as the ordinance in question does.

**21 O. Jur. Title Injunctions, Sec. 57, p. 1064,** holds:

"The statutory definition of injunction, as has already been seen, includes a 'command to * * * do a particular act.' It is evident, therefore, that the principle that a court of equity is not limited to the restraint of a contemplated or threatened action, but may require affirmative action where the circumstances of the case demand it, prevails in Ohio. A mandatory injunction, however, is an extraordinary remedy, and the right thereto exists only when some fundamental or organic right already vested has been abridged, infringed upon, or eliminated. It most frequently issues to compel a party to restore a status which he has wrongfully changed."

This Court cannot control the discretion of the City of Columbus during length of lease as a rooming house permit or license is something that depends on other factors than determined in this case. The Court therefore holds in favor of plaintiff so far as to require the City of Columbus to issue licenses for the years for which applications have been filed and which are the basis for the within case.

This Court would like to say further that it is the responsibility of the public at large not to ignore the problems which exist and which may in many instances not touch them except indirectly, but to accept the responsibility to provide, so far as possible, an environment so that all people might have an opportunity to live a healthy normal existence and not to wash their hands of the problems that exist such as is contained in this case, as well as many others. It is time that we take a sensible view toward the social problems which come from an increased urban population and not to put the burden upon certain public servants alone for the solution of these problems but recognize that they are the problem of all people in a democracy and that the one thing that each of us should strive for above all, in our duty to others, is to see that all people are adequately furnished with the facilities which will provide them with the type of an environment which will help them to lead happy and normal lives. Let us remember that with longevity becoming a common thing, if each of us lives long enough, mental retardation and senility may be our lot, so we can see that the problem here presented is one to be solved and not ignored.

Judgment for plaintiff for mandatory injunction to have issued rooming house permit for years as set forth in petition.