**BRAWNER BUILDING, INC., et al.**

**v.**

**R. Roderick SHEHYN, Walter E. Washington, Commissioner, District of Columbia, et al., Appellants.**

**No. 24268.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 14, 1970.

Decided Feb. 23, 1971.

Mr. David P. Sutton, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Hubert B. Pair, Acting Corporation Counsel at the time the brief was filed, and Richard W. Barton, Assistant Corporation Counsel, were on the brief, for appellants.

Mr. George H. Clark, Washington, D. C., with whom Messrs. Whayne S. Quin and Bruce S. Mencher, Washington, D. C., were on the brief, for appellees.

Messr. Stephen J. Pollak and John A. Bleveans, Washington, D. C., filed a brief on behalf of Washington Lawyers' Committee for Civil Rights Under Law, as amicus curiae, urging reversal.

Before LEVENTHAL and WILKEY, Circuit Judges, and SMITH,* Chief Judge, U. S. District Court for the District of Montana.

LEVENTHAL, Circuit Judge:

This case involves the application of the Zoning Regulations of the District of Columbia to a new and important program established by the District for the rehabilitation of prisoners. The District of Columbia Department of Corrections obtained a Certificate of Occupancy from the Bureau of Licenses and Inspections on December 16, 1969, authorizing the use of a residential building leased by the District Government at 2101 N

* Sitting by designation pursuant to 28 U.S.C. § 292(c). (1964).

Street, N.W., as a "Rooming House (Community Correctional Center for the Department of Corrections)." A community correctional center, also known as a halfway house, helps prisoners through the difficult and crucial period of reintegration into the community. This house will also be used for misdemeanants approved for work release programs, and for persons awaiting trial who have been approved for conditional release.

The plaintiffs, owners and operators of substantial rental property in close proximity to the proposed center, brought an action for a preliminary and permanent injunction barring the defendants from using the premises as a community correctional center. The District Court issued a temporary restraining order on December 16, 1969, a preliminary injunction on December 24, 1969, and a permanent injunction on March 25, 1970. On defendants' appeal we remand for further proceedings.

## I. *The Substantive Considerations and the District Court's Ruling*

### A. *Position of District Officials*

The District officials say that there is a rational basis for the administrative decision that a community correctional center possesses sufficient residential attributes to warrant its classification as a "rooming house" under the District of Columbia Zoning Regulations.

### *Residential Features of Center*

The undisputed facts establish a number of residential features for the proposed occupancy. The Department planned no modifications in the structure or appearance of the building at 2101 N Street, N.W., which was residential before the Department leased it. Specifically there are to be no bars or additional locks. The building consists of three stories and a basement and is designed to accommodate forty individuals other than staff personnel. Each story contains ten rooms equipped with wash basins, beds, chairs, wardrobes and chests of drawers. The basement contains a television set and recreational equipment.

The center is to be staffed by an administrator, assistant administrator, administrative aide, secretary, six correctional counsellors, and three charge-of-quarters officers. Their office equipment is to be located on the ground floor. The staff and all residents will wear regular civilian attire.

Prospective residents of the center are to be carefully selected by the Department of Corrections on the basis of their rehabilitation potential. They will consist of individuals who have reached or who are nearing their parole eligibility dates, misdemeanants sentenced by the Court of General Sessions and considered good risks for a work-release program, and individuals released under the Bail Reform Act and awaiting trial. The average stay of a person at the center will be from three to four months in duration.

Upon arrival, a person is to be exposed to a three-day orientation program during which he is not permitted to leave the center except for meals. The new resident will be familiarized with what is expected of him, attempts will be made to place him in a job, and a savings account will be opened in his behalf. Once successful job placement is accomplished and the resident has been at the center for a period of two weeks, he will be permitted a day's furlough. After the third week, he will be allowed two days' furlough and ultimately will be permitted to remain overnight with his family. No meals are to be served at the center. Instead, residents will eat in the vicinity of their places of employment and will be expected to defray the expenses of their meals from their earnings. They will be taken to their places of employment by public transportation facilities and will be required personally to meet transportation expenses. Residents of the center additionally will be required to pay to the District of Columbia Government the sum of $2 daily for their lodging. Any remaining monies earned by the resi-

dents will be placed in their respective savings accounts for the support of their dependents.

Staff members will wear no uniforms and possess no weapons, and their authority to enforce discipline will be civilian rather than prison guard in character. A resident may leave the premises through the front door without use of keys. If he needs off-premises counselling or medical attention he will not be placed under security or restraint while proceeding to his destination. While the applicable center regulations state that a resident's "[f]ailure to return to the Center within one hour after scheduled time of return will be considered an escape," the matter would not customarily be placed in the hands of the police or FBI until informal, amicable attempts to effect an overdue resident's return have been exhausted by the staff.

While appellants' arguments in this case have emphasized the residential aspects of the center to support their argument for a rooming house certificate of occupancy, we are not unmindful that these residential attributes are a central aspect of the rehabilitative potential of the program. Studies have shown that "the period immediately following release from prison is most critical. It is during this period that all too many offenders get back into trouble as a result of an almost total lack of resources, guidance, employment and even food and shelter." S.Rep.No.613, 89th Cong., 1st Sess. 2 (1965).

The halfway house bridges the gap between institutionalized custody and private life in the community. The benefits for its residents and society are manifold: individuals can support their families by the earnings from their jobs while living at the center and thereby retain and gain self-respect; they can become contributing members of society while finishing their sentences; they can gain training and a means of demonstrating their employment ability, thus earning community acceptance; and they can reestablish and maintain contacts with their families and the realities of life in a residential setting. H. Perlman and T. Allington, The Tasks of Penology 187 (1969). The 1965 Prisoner Rehabilitation Act, 79 Stat. 675, specifically authorized such residential community treatment centers. 18 U.S.C. § 4082(f) (Supp. V 1965–69).

*Pertinent zoning regulations*

The District Court found that the proposed center was located in an R–5–B zone, described as "General Residence . . . Medium density" in the D.C. Zoning Regulations, § 2101.11 (1966).

While the litigation has not been structured in these terms we interject the observation that the Community Correctional Center in this case might well be permitted in an R–5 district whether or not it is characterized as a "rooming house." "The R–5 Districts are designed to permit a flexibility of design by permitting in a single *district* * * * all types of urban residential development. * * * These *districts* would also permit the construction of those institutional and semi-public *buildings* which would be compatible with adjoining residential uses and which are excluded from the more restrictive Residence Districts." Zoning Regulations, § 3105.1. Hence R–5 use is justified by a mere finding that the center is "compatible" with adjoining residential uses.

But the Department of Corrections applied for a "rooming house" certificate of occupancy because rooming houses are permitted as a matter of right not only in R–5 districts, but also in the more restrictive R–4 districts, where other centers are located.[1]

"Rooming house" is defined in Section 1202 of the Zoning Regulations as "a building or part thereof other than a motel, hotel, or private club, which provides sleeping accommodations for three or more persons who are not members of the immediate family of the operator or

---

1. D.C. Zoning Regulations, §§ 3105.3, 3105.31, 3104.36 (1936).

manager, and such accommodations are not under the exclusive control of the occupants thereof."

### Precedents supporting District's position

The District officials have brought cases to our attention that tend to support their position that the Center fits the Rooming House definition, at least to the extent that such a conclusion might not be unreasonable.

Although Beckman v. City of Grand Island [2] is not precisely in point, it certainly indicates that in zoning regulations, the term "boarding or rooming house" is not to be confined to its historic or conventional use when the regulations provide their own definition. The Supreme Court of Nebraska held that "boarding house" included a rehabilitation center or recovery house for alcoholics where room and board would be furnished. The regulations defined a boarding house as "[a] building, other than a hotel, where lodging and meals are provided for four or more persons, not members of a family, for compensation." The court said that no other limitations were expressed, so no others might be considered. Restrictions in zoning regulations should not be extended by implication to cases "not clearly within the scope of the purpose and intent manifest in their language." The court held that the evidence brought the use well within the definitions, saying, "the character of use meets all the requirements of a boarding house within the meaning of the zoning regulations." 157 N.W.2d at 773. We take note that in that case not only the building inspector who granted the certificate of occupancy but also the board of adjustment, on appeal, determined that the proposed use was permitted under the zoning ordinances and regulations.

In Beckman, there was no custody; the occupants were free to come and go. However, in Unteed v. Lehman, 77 Ohio L.Abst. 353, 150 N.E.2d 509 (C.P.Ohio 1957), the court granted an injunction to issue a permit for a rooming house even though the use was a halfway house where former inmates of the state school for the mentally retarded were kept under "supervision" pending decision by officials whether they were making sufficient progress to authorize their discharge and "return to society," or whether they "[should be] returned to the State School." 150 N.E.2d at 511.

### Administrative constructions

The record includes testimony of the Zoning Administrator for the District of Columbia that he participated in the drafting of the Zoning Regulations in 1958, that his duties include both administering and interpreting the regulations, and that he authorized the issuance of the certificate of occupancy to the premises involved in this case. He also testified that he issued a rooming house occupancy certificate to a halfway house for the mentally ill in 1961 and to a halfway house for juvenile delinquents in 1965. The certificates of occupancy and departmental memoranda showing the determination that such facilities were deemed residential were received into evidence.

The District officials rely, finally, on the rule of Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), requiring courts to defer to contemporaneous and reasonable administrative interpretations of regulations.

### B. Objections of Neighbors

Plaintiffs, now appellees, insist that a community correctional center is not a rooming house. They say that the Zoning Commission did not provide for such centers in any use district in the Zoning Regulations because such use was unknown in 1958 when the regulations were promulgated. They emphasize the number of staff members present in the center and the manifold services they provide, both to the residents and to others on an out-patient basis. They say, "The

2. 182 Neb. 840, 157 N.W.2d 769 (1968).

community correctional center use is not provided for in the regulations and the only way it can become a part thereof is by legislative enactment. The Zoning Administrator is not the legislature." They contend that the Zoning Administrator's effort to accomplish this result by interpretation was clearly erroneous, unsupported by written opinion or reasoning, and not worthy of judicial deference.

### C. Ruling of the District Court

The District Judge, like the parties, recognized the meritorious nature of the community correctional center program.[3] The problem, in his words, is that "everybody wants them, but nobody wants them around them." The legal issue to which the evidence and arguments were directed was whether or not the proposed center was a "rooming house" within the meaning of the Regulations. The District Judge found that it was "essentially a correctional operation," not a rooming house, and issued the injunction.

### II. Significance of Administrative Expertise; Doctrine of Primary Jurisdiction

Over and above the substantive contentions of the parties are issues and contentions relating to the proper roles of the court and of the executive officials and agencies concerned with the formation and application of the zoning regulations.

■ The application of zoning regulations involves a significant zone of administrative discretion. The actions, and in that term we include the omissions and failures to act, of the various officials, boards and commissions are subject to judicial review. But the doctrines of law that must be applied in the exercise of this function of review require the court to affirm the executive or administrative action, whether or not the disposition of the underlying problem is one which the court would have chosen or reached in the first instance, so long as the action is within the broad discretion of the zoning officials. For the most part, the ultimate test is reasonableness. Even in cases where an action is challenged as flouting the applicable law or regulation, where the issue of validity is examined in terms of legislative intention as discerned from language or history, issues of reasonableness are likely to play a significant role. This general doctrine has full vitality for zoning decisions, as appears from Wolpe v. Poretsky, 79 U.S.App.D.C. 141, 144 F.2d 505, cert. denied, 323 U.S. 777, 65 S.Ct. 190, 89 L.Ed. 621 (1944), discussed below, a case where the court took great pains to keep the door of judicial review open,[4] then insisted vigorously on observing the restricted scope of judicial review.

■ We think the District Court erred in determining the merits, and ordering a permanent injunction, without requiring recourse to the administrative remedies available to the parties that would have provided the guidance of administrative expertise which the courts should require.

### A. Zoning Administration in the District of Columbia

The Zoning Act of June 20, 1938, 52 Stat. 797, as amended, created the present structure of zoning administration in the District of Columbia. It empowered the Zoning Commission[5] to divide

3. He said, "I do not think anybody recognizes more than this Court the desirability of this type of operation. We have come to them late, and we have come to them too little, and we ought to have more of them instead of fewer of them."

4. This court permitted an affected landowner to intervene for purposes of appeal, although not a party in the trial court, when the official representing his interests decided to drop the litigation.

The doctrine permitting intervention for purposes of appeal was also applied in Zuber v. Allen, 131 U.S.App.D.C. 109, 402 F.2d 660 (1968), aff'd, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); and Smuck v. Hobson, 132 U.S.App. D.C. 372, 408 F.2d 175 (1969) (en banc).

5. The Zoning Commission is now composed of the Chairman of the District of Columbia Council, the Commissioner of the District of Columbia, the Vice Chair-

the District of Columbia into zones or districts and to promulgate regulations. D.C.Code § 5–413 (1967). It also created the Board of Zoning Adjustment, which the Zoning Commission could empower by regulation to perform adjustment and review functions typical of a zoning board of appeals.[6] Article 82 of the Zoning Regulations sets forth the Board's procedure of hearing appeals and granting variances. The Board is an expert body composed of five members,

> "* * * namely, one member of the National Capital Planning Commission or a member of the staff thereof to be designated in either case by such commission; one member of the Zoning Commission or a member of the staff thereof * * *; and three other members, each of whom shall have been a resident of the District of Columbia for at least three years immediately preceding his appointment and at least one of whom shall own his own home." D.C.Code § 5–420 (1967).

The Board's appellate jurisdiction is broad, embracing appeals

> "by any person aggrieved, or organization authorized to represent such person, or by any officer or department of the government of the District of Columbia or the federal government affected, by any decision of the inspector of buildings granting or refusing a building permit or granting or with-

holding a certificate of occupancy, or any other administrative decision based in whole or part upon any zoning regulation or map * * *." D.C. Code § 5–420 (1967), *see also* Zoning Regs. § 8206.1.

The full reasons for its decisions must be entered by the Board in its minutes book, Zoning Regs., § 8202.64. Therefore the parties and a court reviewing the determination receive an adequate statement of the considerations persuading the Board to reach its decision. *See* Robey v. Schwab, 113 U.S. App.D.C. 241, 307 F.2d 198 (1962). The Board's decisions are subject to review in the District Court. McCloskey v. Scrivener, 238 F.Supp. 497 (D.D.C.1965). In performing its function of judicial review, the District Court considers the Board's findings and determinations and will not substitute its own judgment so long as there is a rational basis for the Board's opinion. *See* Seldon v. Capitol Hill Southeast Citizens Association, 95 U.S.App.D.C. 62, 219 F.2d 33 (1954), cert denied, Capitol Hill Southeast Citizens Ass'n v. Coe, 349 U.S. 944, 75 S.Ct. 873, 99 L.Ed. 1271 (1955); *Cf.* Clouser v. David, 114 U.S.App.D.C. 12, 309 F.2d 233 (1962), cert. denied 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963).[7]

In the case at bar the neighbors brought suit under D.C.Code § 5–422 (1967) for an injunction. Section 5–422

man of the Council, Director of the National Park Service, and the Architect of the Capitol. D.C.Code § 5–412 (Supp. III 1970).

6. *See generally* 2 A. Rathkopf, The Law of Zoning and Planning, ch. 37 (3d ed. 1966).

7. Judicial deference to Board determinations properly supported by written reasoning has been explained by reference to the Board's sound discretion, which must be upheld if not arbitrary, capricious, or unreasonable. Hyman v. Coe, 146 F.Supp. 24, 27 (D.D.C.1956). However, the District Court in Hot Shoppes, Inc. v. Clouser, 231 F.Supp. 825, 834–835 (D.D.C.1964), aff'd mem., 120 U.S. App.D.C. 353, 346 F.2d 834 (1965), has said "that there is greater discretion vest-

ed in the Board in granting or denying variances than there is in determining whether 'error' has been committed by any official, particularly where * * * the alleged error was one of statutory interpretation." For judicial review purposes, this discretion-measuring approach may be overcome by judicial recognition of administrative expertise in "working with" a statute or regulation. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Gulf Oil Co. v. Hickel, 140 U.S.App.D.C. 368, 435 F.2d 440, (Oct. 19, 1970). The expertise of the Board in this case includes familiarity with the overall use patterns of the District of Columbia, which must be taken into account along with the plain meaning of the statute and regulations.

makes it unlawful to construct or use any building or structure without obtaining the necessary building permit or certificate of occupancy, or in violation of the Zoning law or Regulations. Violations are prosecuted by the Corporation Counsel in the Court of General Sessions, which can impose fines of up to $100 per day of violation duration. The statute further provides:

"The corporation counsel of the District of Columbia or any neighboring property-owner or occupant who would be specially damaged by any such violation may, in addition to all other remedies provided by law, institute injunction, mandamus, or other appropriate action or proceeding to prevent such unlawful erection, construction, reconstruction, alteration, conversion, maintenance, or use, or to correct or abate such violation or to prevent the occupancy of such building, structure, or land."

■ There is no doubt of the right of property owners to seek to enjoin a use or proposed use of nearby or neighboring land that is both unlawful and adversely affects their interests. Wolpe v. Poretsky, *supra*; Hazard v. Blessing, 55 App.D.C. 114, 2 F.2d 916 (1924). The problem is the appropriateness of the District Court's deciding on the merits a claim that a use authorized by a certificate of occupancy unlawfully contravenes the zoning regulations in the absence of an appeal from the granting of the certificate of occupancy, and a decision by the Board.

As we have said, the District Court is the proper forum for review of Board decisions, and its jurisdiction does not defeat the criminal jurisdiction of the Court of General Sessions. But must aggrieved neighbors first exhaust their administrative remedies before coming to court?

The terms of the statute are not decisive. Section 5–422 grants the neighboring property owners or occupants the remedies of injunction and mandamus "in addition to all other remedies provided by law." [8] But the availability of mandamus or injunction depends on the jurisprudence underlying the proper occasion for the issuance of those writs. In United States ex rel. Connor v. District of Columbia, 61 App.D.C. 288, 289, 61 F.2d 1015, 1016 (1932), we affirmed a dismissal of a petition for a writ of mandamus to compel issuance of a building permit on the ground that when "appellants' application for a permit was denied, there was available to them an appeal to the Zoning Commission" (under the zoning law then in force) which appellants had not taken. Judge Robb invoked the familiar principle, "Where a party has a right to a writ of error or appeal, he may not resort to the extraordinary writ of mandamus or prohibition."

Decisions of the courts of many jurisdictions require exhaustion of adequate administrative remedies before permitting suits challenging the constitutionality of the application of zoning ordinances. *See generally* 2 A. Rathkopf, The Law of Zoning and Planning, ch. 35, § 2 (3d ed. 1966); and 3 E. Yokley, Zoning Law and Practice, § 23–5 (3d ed. 1967). The policy considerations underlying the doctrine requiring exhaustion of administrative remedies are also applicable where the challenge is directed at administrative action alleged to be

---

8. D.C.Code § 5–422 was added by § 10 of the Zoning Act of June 20, 1938, 52 Stat. 800, ch. 534. The language quoted in the text derives from the last sentence of § 5–422, which was not contained in the prior law. The last sentence of Section 9 of the Zoning Act of 1920, 41 Stat. 500, simply provided: "The corporation counsel of the District of Columbia may maintain an action in the Supreme Court of the District of Columbia in the name of the District of Columbia to abate and perpetually enjoin such nuisance." The legislative reports do not discuss the significance of the change from the prior language. *See* S.Rep.No.1962, 75th Cong., 3d Sess. 5 (1938); H.R. Rep.No.2418, 75th Cong., 3d Sess. 2 (1938).

contrary to the zoning ordinance and such action is reviewable by a board of appeals.

A board of appeals or adjustment is an essential part of the zoning apparatus. As the New York courts have said:

"In the early days of zoning a board of appeals was considered a device merely for rounding off the sharp corners of the zoning requirements. Such a board is now considered absolutely necessary to the same operation of a zoning ordinance. It is the safety valve of the zoning plan. A zoning ordinance, like a steam boiler, will sooner or later, blow up if there is no safety valve. Where there is a functioning board of appeals to which every aggrieved applicant for a permit may resort, litigation automatically assumes the form of a court review of the discretion of the board, instead of out and out attacks on * * * specific instances of regulation." [9]

"The creation of a board of appeals, with discretionary powers to meet specific cases of hardship or specific instances of improper classification, is not to destroy zoning as a policy, but to save it." [10]

We have recognized the "safety valve" aspect of administrative reconsideration in other regulatory contexts. See WAIT Radio v. F.C.C., 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969). And in Wolpe v. Poretsky, *supra,* allowing adjoining property owners to intervene in a suit to enjoin the carrying out of a zoning order, this court said:

* * * [H]ere an administrative body is charged with arbitrary and capricious action in the face of a strong presumption that they properly performed their duties. Some of the reasons relied on by the [district] court in declaring the zoning order

void are more pertinent as arguments to influence the judgment of the Commission in balancing the various considerations laid down by the act than they are to support a ruling that the Commission's order was arbitrary and capricious. It is not the function of the court to substitute its judgment for that of the Commission even for reasons which appear most persuasive. 79 U.S.App.D.C. at 143–144, 144 F.2d at 507–508.

These considerations have pertinency for the case at bar. We do not say that the administrative appeal had to be exhausted as a condition of bringing suit for injunction. A property owner may be entitled to temporary relief in order to avoid irreparable injury, and if relief cannot be provided through the administrative remedy, there is a basis for a court's preliminary injunction. Assuming the District Court had jurisdiction to consider, and to grant or deny, the application for injunctive relief *pendente lite,* and was not required by the exhaustion doctrine to dismiss the litigation, nevertheless under the doctrine of primary jurisdiction it should not have proceeded to a final determination of the merits but should have stayed the action pending an appeal to the Board.[11] This doctrine bids a court wait while the agency that has "primary jurisdiction" makes the initial determination —"until the administrative agency that has special competence in the field has ruled on [the issues]." Best v. Humboldt Placer Mining Co., 371 U.S. 334, 338, 83 S.Ct. 379, 383, 9 L.Ed.2d 350 (1963).

Even assuming that an action is clearly within the jurisdiction assigned to a court, its sound discretion may require that the judicial tribunal wait until there is initial consideration by an agency. The reason for the doctrine is "that a

---

9. Van Auken v. Kimmey, 141 Misc. 105, 252 N.Y.S. 329, 341 (Sup.Ct.1930).

10. People ex rel. St. Bazil's Church of City of Utica v. Kerner, 125 Misc. 526, 211 N.Y.S. 470, 477 (Sup.Ct.1925).

11. Sometimes the court dismisses the action pending administrative recourse.

court confronted with problems within an agency's area of specialization should have the advantage of whatever contributions the agency can make to the solutions." 3 K. Davis, Administrative Law Treatise § 19.09 at 53 (1958). As Professor Davis points out, the doctrine, though judge-made, has been applied notwithstanding the existence of statutory provisions giving jurisdiction to the courts without qualification. *Id.*

An authoritative statement of the doctrine of primary jurisdiction appears in Justice Harlan's opinion in United States v. Western Pac. R.R., 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956):

> "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

The vitality and value of the primary jurisdiction doctrine was made clear in the Supreme Court's recent decision in Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 68–69, 91 S.Ct. 203, 208, 27 L.Ed.2d 203 (1970):

> * * * [T]his Court recognized early in the development of administrative agencies that coordination between judicial machinery and these agencies was necessary if consistent and coherent policy were to emerge. See Texas & P.R. Co. v. Abilene Cotton Oil

Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). The doctrine of primary jurisdiction has become one of the key judicial switches through which this current has passed. When there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved. [citing cases] [footnote omitted].

Weighing the relevant facts, the Court found that the Federal Maritime Commission had a primary supervisory responsibility over petitioners' kind of conference, had approved the very agreement whose scope was the subject of dispute, and was "uniquely qualified to consider the dispute in light of the overall policies" relevant thereto. This added up to "an almost classic case for engaging the doctrine." In *Port of Boston Marine Terminal Ass'n,* the District Court stayed the proceedings to await a ruling by the FMC even though the FMC's decision was appealable exclusively to the Court of Appeals. Since in the case at bar a decision by the Board of Zoning Adjustment would be reviewable by the District Court itself, that court was not even confronted with any problems arising from the complication of review by different judicial tribunals.

■■ A litigant entitled to permanent relief under the zoning regulations may be compelled to pursue his administrative remedies rather than be able either to resort to self-help or to seek an initial judicial determination.[12] Routing the dispute at bar to the Board of Zoning Adjustment will certainly further the ultimate goal of "consistent and coherent policy." In deprecating the significance of the Zoning Administrator's de-

---

12. Compare McCloskey v. Scrivener, 238 F.Supp. 497 (D.D.C.1965) (denying motion to enjoin a prosecution in General Sessions for construction without a certificate of occupancy, even assuming that,

on review of the Board of Zoning Adjustment, the court might determine that a certificate of occupancy was wrongfully withheld).

cision herein the neighbors noted that it was unsupported by written reasoning or articulated factual bases. The Zoning Administrator functions at a lower administrative level than the Board and with different procedures. Low-level administrative opinions are not entitled to the same judicial deference as rulings that represent the last administrative word. L'Enfant Plaza North, Inc. v. D.C. Redevelopment Land Agency, 141 U.S.App.D.C. 265, 437 F.2d 698 (December 10, 1970). Sound discretion leads the court to await the "last word" of administrative expertise and perspective, complete with fully articulated reasoning where that is available, before the court exercises its limited role of judicial review. *See generally* Greater Boston Television Corp. v. F.C.C., 143 U.S.App.D.C. ——, 444 F.2d 841, 852 (Nov. 13, 1970).

### III. *Questions on Remand, and Issue of Temporary Injunction*

Upon remand, the District Court will be faced with a new question. Whether or not to grant a preliminary injunction involves a forecast of plaintiff's probability of success on the merits. But that question is different in various respects from that already considered by the court. First, the Board may have added perspective for consideration of the "rooming house" issue in the light of its active concern with the zoning regulations as a whole. Second, the Board may decide that in any event a Community Correctional Center is a permissible R–5–B use. And, in either event, the ultimate issue before the court will be, not how it would have decided, but is the Board's decision unreasonable as a matter of law.

Against the probability of success must be weighed the threatened irreparable injury, if any, to appellees. We

revert to the fact that the subject district is classified R–5, so the proposed center could be permitted as "compatible" even if not deemed a rooming house.[13] Although the Corporation Counsel insisted on oral argument that the District would prefer to prevail, if at all, on the "rooming house" argument for the reasons explained above, the granting of a permit under the R–5 "compatible" standard would permit observation of a center's actual operation. Experience may be the best testing ground for administrative rulings that essentially represent forecasts and projections, at least in the absence of interim damage that is truly irreparable. American Airlines v. C.A.B., 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

If the Board undertakes consideration by reference to the "rooming house" definition, its explication of this problem may illuminate the reasonableness of its construction, which will generally be given weight unless contrary to a construction that can be identified as lacking all ambiguity. Wright v. Wardman, 55 App.D.C. 318, 5 F.2d 380 (1925).

Another possibility is that the Board may decide to handle the zoning problem by reference to its power to "make special exceptions to the provisions of the zoning regulations in harmony with their general purpose and intent." D.C.Code, § 5–420; *see* Zoning Regs. § 8207.2.

Finally, we recall that Congress established the zoning law, and gave broad powers to the Zoning Commission, delegated in part to the Board of Zoning Adjustment, "[t]o promote the health, safety, morals, convenience, order, prosperity, or general welfare of the District of Columbia and its planning and orderly development as the national capital.

---

13. We note that some zoning regulation schemes specifically prohibit "penal or correctional" institutions in residential districts. *See* the *Unteed* case, 150 N.E. 2d at 511, and the *Beckman* case, 157

N.W.2d at 771. The D.C. Zoning Regulations contain no such specific exclusion. The neighbors can rely only on the general provision of § 3105.2, forbidding all uses not specifically permitted.

\* \* \*" D.C.Code § 5–413. We have consistently recognized the primacy of the public interest and general welfare in considering zoning problems. Aquino v. Tobriner, 112 U.S.App.D.C. 13, 298 F.2d 674 (1961); Lewis v. District of Columbia, 89 U.S.App.D.C. 72, 190 F.2d 25 (1951); Leventhal v. District of Columbia, 69 App.D.C. 229, 100 F.2d 94 (1938).

As to the parties to this suit and the District Court agree, community correctional centers, or halfway houses, are in the public interest. The question is, where are they to be located. The use proposed in this case is not irreversible; it is only a *use* of an existing structure, not a new edifice. Equity considers not only the interest and injuries forecast by the parties but also the public interest. Virginian Ry. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937). "[W]here an injunction is asked which will adversely affect a public interest \* \* \* the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944).

■ To sum up, a court should not hold invalid a classification by a zoning official if there is a need for, and possibility of, administrative expertise that might illuminate the matter. A temporary injunction may be available on the basis of probability of success, and the need to protect against irreparable injury *pendente lite*, but this should be conditioned on prompt recourse to the administrative remedy of appeal to the Board of Adjustment. Whether or not there is a temporary injunction the court's determination of the merits should await the guidance of the Board's expertise and reasoning.

■ In the case at bar plaintiff's prayer for temporary injunction pending the appeal must take into account that their legal interests are only those of owners of property in an R–5–B zone. Such owners are not entitled, under the zoning regulations, to insist that their neighbors operate rooming houses; it is enough if they operate institutional buildings "compatible with adjoining residential uses." With this element in the case, the public interest considerations already mentioned by the District Court may soundly be given dominance over plaintiffs' claim of irreparable injury. However, in accordance with traditional doctrine, we remit to the District Court as the court of first instance, the issue whether the temporary injunction should be retained pending the appeal to the Board of Zoning Appeals.

The permanent injunction is vacated. The case is remanded for reconsideration of the temporary injunction, and for stay of the action on the merits pending prompt appeal by plaintiffs to the Board of Zoning Appeals.

So ordered.