**CAPITOL HILL RESTORATION SOCIETY et al., Petitioners,**

v.

**The ZONING COMMISSION of the District of Columbia, Respondent,**

**Graham Building Associates, Inc., and the Committee of 100 on the Federal City, Intervenors.**

**No. 9130.**

District of Columbia Court of Appeals.

Argued Dec. 4, 1975.

Decided Nov. 23, 1977.

Stephen M. Truitt, Washington, D. C., with whom Greer S. Goldman, Washington, D. C., was on the brief, for petitioners.

Louis P. Robbins, Principal Deputy Corp. Counsel, Washington, D. C., with whom C.

Francis Murphy, Corp. Counsel, Washington, D. C., when the brief was filed, Richard W. Barton, Deputy Corp. Counsel, and Leo N. Gorman, John C. Salyer, Iverson O. Mitchell, and Beth-Ann Gentile, Asst. Corp. Counsel, Washington, D. C., were on the brief, for respondent.

Norman M. Glasgow, Washington, D. C., with whom Whayne S. Quin and John F. McCabe, Jr., Washington, D. C., were on the brief, for intervenor Graham Building Associates, Inc.

Peter S. Craig, Washington, D. C., entered an appearance for intervenor, The Committee of 100 on the Federal City.

Before HARRIS, Associate Judge, REILLY, Chief Judge, Retired, and GREEN, Associate Judge, Superior Court of the District of Columbia.*

HARRIS, Associate Judge:

 Petitioners, a civic association and three individual residents of the Capitol Hill area, seek judicial review of Zoning Commission Order No. 110 pursuant to the District of Columbia Administrative Procedure Act (DCAPA).[1] That decision, dated December 19, 1974, amended the Zoning Map as to one portion of the Capitol Hill East area to permit more intensive development thereon. Petitioners ask that the decision be set aside on the grounds that (1) the Commission committed procedural irregularities in issuing the order; (2) the Commission violated the Zoning Act by approving a map amendment inconsistent with the comprehensive plan for the National Capital;[2] and (3) the Commission engaged in illegal "spot zoning." We affirm the Commission's action.

I

The challenged order rezoned a 2.2 acre vacant parcel of land at the intersection of Pennsylvania and Potomac Avenues in the southeast quadrant of the city. The land is owned by intervenor Graham Building Associates, Inc. (Graham), and two individuals.[3] Part of the land, like most of the surrounding property, had been zoned R-4, while the remainder of the tract carried C-2-A zoning.[4] The area is largely a low-to-medium density residential neighborhood, with some areas of medium density apartment projects. The Potomac Avenue Station of the Metro subway's Blue Line is only 500 feet away (diagonally across the intersection) from the rezoned land.[5]

Graham has sought authorization to develop the Potomac Avenue site several times. In 1970, it applied for approval of a Planned Unit Development under Article 75 of the Zoning Regulations. The Zoning

---

* Sitting by designation pursuant to D.C.Code 1973, § 11-707(a).

1. D.C.Code 1977 Supp., § 1-1510. The Zoning Commission is specifically included among those District of Columbia agencies over whose actions (in contested cases) this court has review responsibility. D.C.Code 1973, § 11-722.

2. The Commission may amend zoning maps and regulations after public hearings. D.C. Code 1973, § 5-415. Effective January 2, 1975, maps and regulations, and amendments thereto, "shall not be inconsistent with the comprehensive plan for the National Capital." D.C. Code 1977 Supp., § 5-414. Ordinarily, a court is to apply the law existing at the time of its decision. Cort v. Ash, 422 U.S. 66, 76-77, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); Bradley v. School Board, 416 U.S. 696, 711-16, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). We do so here, and examine the amendment for conformity to the comprehensive plan.

3. H. S. Bogen owns 55,449 square feet; William Travis owns 12,262 square feet; and Graham owns 27,597 square feet.

4. "The R-4 District is designed to include those areas now developed primarily with row dwellings, but within which there have been a substantial number of conversions of such dwellings into dwellings for two or more families. Very little vacant land would be included within this district since its primary purpose would be the stabilization of remaining one-family dwellings." D.C.Zon.Reg. § 3104.1.

A C-2-A district is for predominant use as a community business center of medium density, with a maximum building height of 60 feet. Id., App. A.

5. We take judicial notice of the fact that the station opened in July of this year and that trains serving the station presently run from RFK Stadium at one end of the Blue Line to National Airport at the other.

Commission granted that application the following year, but we vacated that order for noncompliance with the DCAPA. *See Capitol Hill Restoration Society v. Zoning Commission,* D.C.App., 287 A.2d 101 (1972). In 1973, Graham filed an application to rezone the property C–3–B, *i. e.,* a high bulk major business and employment center with a maximum building height of 90 feet and a maximum floor area ratio of 6.5. D.C.Zon. Reg., App. A. The Commission denied that application, but invited Graham to submit a new application and suggested that planning officials study the site and its surrounding area. The District's Office of Planning and Management then prepared a study entitled "Potomac Avenue Metro Impact Area Report" which was published in May of 1974.

On July 16, 1974, Graham applied for rezoning of the property to C–2–B, encompassing a medium high and high density use as a community business center, which would allow business uses on the lower floors and residential uses on the higher floors. The maximum allowable building height in a C–2–B district is 90 feet. The normal maximum floor area ratio is 3.5, but that may be increased to 6.0 by special action of the Commission. Graham's proposal was to build a 65-foot building with 401 apartments and about 35,000 gross square feet of commercial space at ground level.

The Commission held a hearing on the application on November 13, 29, and 30, 1974. It conducted the proceeding as a contested case under Part II of its Rules of Practice and Procedure.[6] At the hearing, Graham presented the testimony of Buford Hayden, a land planner who characterized the area's land utilization pattern as a mixture of commercial, institutional, and multi-family uses, with row houses at a greater distance from the property. He expressed the opinion that the proposed rezoning would be compatible with the general land use objectives of the National Capital Planning Commission's Comprehensive Plan for the National Capital. Graham's president, Berkley G. Burrell, testified that the proposed rezoning would benefit the city's tax base and stabilize local property values. Stephen S. Peterson, a traffic engineer, testified that there was a very low likelihood that the proposed development would adversely affect traffic at the intersection of Potomac and Pennsylvania Avenues. Graham's counsel informed the Commission that his client voluntarily had covenanted with the neighboring landowners to limit the height of any building on the site to 65 feet, notwithstanding the normally permissible C–2–B height of 90 feet.[7]

J. Kirkwood White, Assistant Director of the District of Columbia's Office of Planning and Management (OPM), offered testimony in support of the application based on OPM's analysis of the site and the surrounding neighborhood as set forth in the "Potomac Avenue Metro Impact Area Report." A member of the Zoning Advisory Council recommended approval on the grounds that the rezoning would break up the commercial strip zoning along Pennsylvania Avenue and increase use of the Potomac Avenue Station of Metro's subway line.

Representatives of the National Capital Planning Commission, which held its own hearing on the application, opposed it. They testified that the development's high density would exceed that prescribed for

**6.** *See* 20 D.C.R.R. § 2.1 *et seq.* (1972). In determining whether or not to treat a proceeding as a contested case, the Commission has provided that it

. . . will consider the number and size of lots or parcels to be rezoned, the number of owners, whether there are fact questions of specific applicability or whether facts, information and views from a wide cross section of the public are sought by the Commission to aid it in making a policy decision directed toward the general public. *Id.,* § 2.22.

*See Palisades Citizens Ass'n v. Zoning Comm'n,* D.C.App., 368 A.2d 1143, 1147 (1977).

**7.** The Zoning Regulations exempt from their height limitations spires and similar architectural embellishments, smokestacks, chimneys, radio and television towers, and stairway and elevator penthouses which are set back certain distances from lot lines. §§ 3201.21–.26, 4201.-21–.22, 5201.21, 5201.23, and 6201.21–.22.

the area in the comprehensive plan and would generate commercial development in nearby areas which, in their view, should remain predominantly residential.

The Capitol Hill Restoration Society and several other citizens' organizations opposed the application, contending that the proposed development would impair the area's row house character and diminish the quality of life for Capitol Hill residents.

The Commission approved the application on December 30, 1974. The order was filed and served on the parties sometime after January 3, 1975. In conjunction with the order, the Commission issued findings of fact and conclusions of law. They stated that the rezoning would have no adverse impact on the neighborhood, would promote the health and general welfare of the area's residents, and would help stabilize land values. The Commission further determined that the comprehensive plan for the National Capital did not preclude approval of the application, since the density limitations provided by the plan were intended to suggest overall policies for areas, rather than to set lot-by-lot density requirements.

On January 3, 1975, petitioners filed for review in this court. On February 14, they moved for summary reversal on the grounds of alleged procedural irregularities. That motion was denied.

## II

The Corporation Counsel urges that we dismiss the petition for lack of jurisdiction on the ground that this is not a "contested case." *See* D.C.Code 1977 Supp., §§ 1–1502(8), –1510. *See also Dupont Circle Citizens Association v. Zoning Commission*, D.C.App., 343 A.2d 296 (1975) (en banc); *W.C. & A.N. Miller Development Co. v. Zoning Commission*, D.C.App., 340 A.2d

420 (1975) (en banc); *Chevy Chase Citizens Association v. Council*, D.C.App., 327 A.2d 310 (1974) (en banc); *Citizens Association of Georgetown, Inc. v. Washington*, D.C.App., 291 A.2d 699 (1972). We reject this argument for two reasons.

The Commission itself treated this proceeding as a contested case under its own rules. (*See* note 6 and accompanying text, *supra*). We said in *Palisades Citizens Association v. Zoning Commission*, D.C.App., 368 A.2d 1143 (1977): "It was treated as a 'contested case' by the Commission and we see no reason now to view it otherwise." *Id.*, at 1147. Moreover, in an earlier case involving precisely the same applicant and the same parcel of land, we specifically held that the proceeding before the Commission had constituted a contested case. *Capitol Hill Restoration Society v. Zoning Commission, supra*, at 105.

Furthermore, even though zoning generally is of a quasi-legislative nature, some zoning actions nevertheless constitute contested cases. *See Dietrich v. Board of Zoning Adjustment*, D.C.App., 293 A.2d 470 (1972); *Capitol Hill Restoration Society v. Zoning Commission, supra*. We previously have defined a contested case as one "concerned basically with weighing particular information and arriving at a decision directed at the rights of specific parties." *Chevy Chase Citizens Association v. Council, supra*, at 313; *see Citizens Association of Georgetown, Inc. v. Washington, supra*, at 703; *Capitol Hill Restoration Society v. Zoning Commission, supra*, at 105–06. In this case, resolution of the map amendment which Graham sought depended upon the existence of certain specific factors such as the proximity of medium high and high density residential areas, office employment centers, and main highways.[8] We agree

---

**8.** Section 5102.1 of the Zoning Regulations provides:

> 5102.1 The C–2 District, Community Business District, is subdivided into C–2–A and C–2–B Districts. The C–2–A District is designed to provide facilities for shopping and business needs for large segments of the city outside the central core. Such *districts* would be located with access to main high-

ways and include office employment centers. Normally the C–2–A District would be tributary to large residential areas and would permit development to medium bulk proportions. It is within this *district* that designed shopping centers would be encouraged.

The C–2–B District is intended to serve the same commercial purposes as the C–2–A District and at the same time provide for an

with petitioners that an assessment of those factors with respect to property such as that on which Graham intends to build depends not upon broad legislative policy judgments but, rather, upon the presentation of specific evidence concerning the nature of the property and the land use surrounding an applicant's property.[9] Essentially, this case is one in which a single structure is to be constructed on a single piece of land, and the proposal has both opponents and proponents.

### III

Petitioners initially assert that the Commission's deliberations in this case were marked by certain procedural irregularities which violated both the DCAPA and the Commission's own Rules of Practice and Procedure, thereby depriving petitioners of due process of law. Based thereon, petitioners ask that we vacate the Commission's order. We decline to do so.

■■ First, petitioners allege that the Commission improperly considered an ex parte presentation and extra-record material after the hearing record was closed on November 30, 1974. On December 19, 1974, the Commission met in Executive Session to consider Graham's application. Petitioners quite properly had no notice of that meeting. In accordance with past Commission practice, the meeting was closed to the parties, but certain representatives of the news media were in attendance. During the course of the meeting, J. Kirkwood White, the Assistant Director of OPM (who was mentioned above), at the request of the Commission presented a written summary and abstract of the evidence which had been presented at the public hearing. He concluded with OPM's recommendation that the application was appropriate for favorable action.

Following White's presentation, Commissioner Tucker, specifically referring to White's analysis of the issues, moved that the application be granted. The motion carried unanimously, with Commissioner George M. White abstaining.

Petitioners question the propriety of White's presentation in light of his role at the public hearing during which he had testified in favor of the application. The Commission replies that White, as the Assistant Director of OPM, simply was performing the proper function of a staff member to assist the Commission in considering the evidence.

One of the functions of the Director of OPM (and delegable by him) as listed in Commissioner's Order No. 71–307, August 13, 1971, as amended, D.C.Code 1974 Supp., Title 1, Appendix at 34, is:

o. Providing administrative services to the Zoning Commission and the Board of Zoning Adjustment, and performing staff functions relating to zoning regula-

---

increase in residential development. Such districts would be located adjacent to medium-high density residential areas *such as R–5–C, R–5–D, or SP Districts, in Uptown Centers, and at major Rapid Transit Stops.* * *

**9.** *See Fasano v. Board of County Commissioners,* 507 P.2d 23, 26–30 (Or.Sup.Ct.1973) (en banc); *Hyson v. Montgomery County Council,* 242 Md. 55, 217 A.2d 578 (1966).

The Supreme Court of Washington has stated:

Zoning decisions may be either administrative or legislative depending upon the nature of the act. *See Durocher v. King County,* 80 Wash.2d 139, 492 P.2d 547 (1972). But, whatever their nature or the importance of their categorization for other purposes, zoning decisions which deal with an amendment of the code or reclassification of land there-

under must be arrived at fairly. The process by which they are made, subsequent to the adoption of a comprehensive plan and a zoning code, is basically adjudicatory.

Generally, when a municipal legislative body enacts a comprehensive plan and zoning code it acts in a policy making capacity. But in amending a zoning code, or reclassifying land thereunder, the same body, in effect, makes an adjudication between the rights sought by the proponents and those claimed by the opponents of the zoning change. The parties whose interests are affected are readily identifiable. Although important questions of public policy may permeate a zoning amendment, the decision has a far greater impact on one group of citizens than on the public generally. [*Fleming v. City of Tacoma,* 81 Wash.2d 292, 296, 502 P.2d 327, 331 (1972) (en banc).]

tions and the zoning map of the District of Columbia.

Thus, White was acting in accordance with his position as a staff member of the Commission when he presented his analysis of the zoning application to the Commission. Generally, an analysis of evidence by agency subordinates does not have to be submitted to all parties to an agency proceeding in order to satisfy due process requirements. *See* 2 K. Davis, Administrative Law Treatise § 11.09, at 72–77 (1958). Furthermore, staff members may testify as experts at hearings and later give informal advice on the same question to the deciding officers. *See* Davis, *supra*, § 13.01, at 174.

The presentation which White made was a brief summary of the testimony which previously had been presented by the parties at the public hearing. He concluded by recommending favorable action on the application—a recommendation that he already had made at the prior hearing. Since White's presentation was merely a summary of the evidence of record, we conclude that petitioners' rights to a hearing, D.C. Code 1977 Supp., § 5–417, to cross-examination, *id.*, § 1–1509(b), and to have the Commission decide the case on the exclusive record of the proceeding, *id.*, § 1–1509(c), were not violated. Petitioners had ample opportunity to rebut OPM's opinions and recommendation at the public hearing, and to seek and present support for their own position. Therefore, we are not faced with the situation which we condemned in *Quick v. Department of Motor Vehicles*, D.C.App., 331 A.2d 319 (1975), in which the mind of the decider was swayed by evidence which was not communicated to both parties and which one party was not given an opportunity to controvert.[10] *Id.*, at 323. *See also Jarrott v. Scrivener*, 225 F.Supp. 827 (D.D.

C.1964) (Board of Zoning Adjustment action voided due to improper ex parte influences).

■■■ Petitioners' second contention of procedural error is that the Commission's order was not issued before January 2, 1975. Petitioners and the Commission agree that unless the order was issued prior to that date, it is invalid because two of the three Commissioners who approved the order ceased being members of the Commission by operation of law on January 2, 1975. *See* D.C.Code 1973, § 5–412, *as amended by* § 492 of the District of Columbia Self-Government and Governmental Reorganization Act, Pub.L.No. 93–198, 87 Stat. 774 (1973), D.C.Code 1977 Supp., § 5–412.

Under § 1–1509(e) of the Code and § 2.611 of the Commission's Rules of Practice and Procedure, 20 D.C.R.R. § 2.611 (1972), findings of fact and conclusions of law must accompany every order of the Commission in this type of map amendment case. Respondent relies upon § 2.612 of its Rules of Practice and Procedure, which provides that "[a]n amendment to the zoning map shall become effective upon publication of the amendment in a daily newspaper of general circulation. . . ." Rule 2.611, however, provides that "a decision or order of the Commission is final upon filing and service [of the decision or order and the accompanying findings of fact and conclusions of law]."

The Executive Secretary of the Commission submitted an affidavit stating that the purpose of the finality provision of § 2.611 is to determine the time from which a party's right to appeal begins. We previously have held that that type of administrative interpretation is entitled to due respect and ought not to be disregarded unless clearly wrong. *Cook v. James E. Griffith, Inc.*,

---

**10.** We are, nevertheless, disturbed by the Commission's invitation to White to make a presentation in Executive Session on the merits of the application. White, as a representative of OPM, publicly had supported the application. To invite him to address a meeting which was closed to opponents of the application added an unsavory—and readily avoidable—aura to the Commission's deliberations. Although we are not persuaded that the events which transpired

in that meeting rose to the level of a due process violation or a violation of the DCAPA the Commission, by seeking guidance from a staff member who had participated in the hearing, nevertheless jeopardized "that appearance of fairness and impartiality [which] is probably of as great importance as its attainment, if the public is to have confidence in the judicial processes." *Jarrott v. Scrivener*, 225 F.Supp. 827, 834 (D.D.C.1964).

D.C.App., 193 A.2d 427 (1963). We cannot say that the Commission's interpretation is clearly wrong when considered in conjunction with the effectiveness provision of § 2.612 of its Rules.

In *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), the Supreme Court pointed out that the Federal Power Commission had considerable administrative discretion in deciding when an order may be deemed to have been issued. However, the Court did place a limit on such discretion by ruling that knowledge of the substance of the order must, to some extent, be manifested to the public. *Id.,* at 676.

In the instant case, the decision of the Commission was rendered on December 19, 1974, and the related order was "signed" on December 30, 1974.[11] The order was published in the District of Columbia Register on December 27, 1974 [*see* D.C.Code 1977 Supp., § 1–1506(c)], and in the *Washington Star-News* on December 28, 1974 [*see* D.C. Code 1973, § 5–421]. There is some confusion concerning the actual date on which copies of the order were mailed to the parties. The Commission asserts that copies were mailed on January 3, 1975. Petitioners claim that service occurred on January 6, 1975, the date the envelope addressed to counsel was postmarked.

It is clear that the formally issued findings of fact and conclusions of law of the Commission were not made available to the parties until January 3, 1975, at the earliest. Petitioners contend that issuance of the order did not take place prior to that date.

We have not held that strict compliance with the provisions of D.C.Code 1977 Supp., § 1–1509(e), is the only acceptable method of making manifest the knowledge and substance of an order in a contested case.[12] *See Palisades Citizens Association v. Alcoholic Beverage Control Board*, D.C.App., 324 A.2d 692 (1974). In the instant case, publication of the order in the D.C. Register and the *Washington Star-News* allowed the public to acquire a basic knowledge of the effect of the order. While those publications did not include the findings of fact and conclusions of law which are necessary to provide the public and the parties with a thorough understanding of the substance of the order (so as to begin the time within which an appeal may be taken), they nevertheless were sufficient to comply with the requirements articulated by the Supreme Court in *Skelly Oil Co. v. Phillips Petroleum Co., supra.*

We conclude that even if the order did not become final within the meaning of § 2.611 before January 2, 1975, it took effect and was "issued" on December 28, 1974, when it was published in the *Wash-*

---

11. Petitioners contend that the "signing" did not constitute final approval of the application because a majority of the Commissioners who had considered all of the evidence in the case and had voted in favor of the application were not present at the December 30 session. Commissioner Sterling Tucker was the only member who was so absent. Commissioners John A. Nevius, George White, and Richard L. Stanton were in attendance. Furthermore, all four Commissioners, including Mr. Tucker, were present at the December 19 meeting at which the initial decision was made in favor of the application.

We find that a majority of those who were to render the final order did personally hear the evidence as required by D.C.Code 1977 Supp., § 1–1509(d). No evidence was introduced at the December 30 meeting. The record indicates that the purpose of that meeting was merely to review the findings of fact and conclusions of law, and to sign the order which

had been approved by voice vote on December 19. Therefore, Mr. Tucker's absence on December 30 did not trigger the application of § 1–1509(d).

We also are unpersuaded by petitioners' argument that each Commissioner was required to have heard all of the evidence presented in the earlier case involving this same property. Attendance by the Commissioners at the public hearing, and participation in the decision making in this case (No. 74–11), was all that was required.

12. That statute provides:
Every decision and order adverse to a party to the case . . . shall be in writing and shall be accompanied by findings of fact and conclusions of law. . . . A copy of the decision and order and accompanying findings and conclusions shall be given by the Mayor or the agency, as the case may be, to each party or to his attorney of record.

*ington Star-News.* Hence, the timing of its issuance was not fatal to its validity.

## IV

We turn now to petitioners' substantive attacks upon the Commission's order. They first allege that the map amendment is plainly inconsistent with the so-called comprehensive plan for the National Capital. The District of Columbia Code formerly provided that zoning "regulations shall be made in accordance with a comprehensive plan." D.C.Code 1973, § 5–414; *see also* D.C.Code 1967, § 5–414. In *Citizens Association of Georgetown, Inc. v. Zoning Commission,* 155 U.S.App.D.C. 233, 237–38, 477 F.2d 402, 406–07 (1973), the United States Court of Appeals for the District of Columbia Circuit ruled that the plan referred to in § 5–414 [13] was not the "comprehensive, consistent, and coordinated plan for the National Capital" which Congress directed the National Capital Planning Commission (NCPC) to prepare and adopt. *See* D.C.Code 1977 Supp., § 1–1004(a); *see also* D.C.Code 1967, § 1–1004(a). Congress thereafter revised § 5–414 to read: "Zoning maps and regulations, and amendments thereto, shall not be inconsistent with the comprehensive plan for the National Capital . . . ." Pub.L.No. 93–198, § 492(b)(1), 87 Stat. 810 (1973) (codified at D.C.Code 1977 Supp., § 5–414). To that extent, the circuit court's decision no longer is authoritative.[14]

The present interrelationships as to the comprehensive plan between the Mayor, the Council, and the NCPC are somewhat complex, and are set forth in D.C.Code 1977 Supp., § 1–1002. Basically, following posi-tive action by the Council, each District of Columbia element of the comprehensive plan and each amendment thereof must be submitted to the NCPC for review to determine whether there is a negative impact on the "interests or functions of the Federal Establishment in the National Capital." If a negative impact is found, Congress has provided the NCPC with what amounts to a veto power over the District government's proposals. D.C.Code 1977 Supp., § 1–1002(a)(4); H.R.Rep.No.93–482, 93d Cong., 1st Sess., *reprinted in* 1973 D.C.Code Leg. & Ad.Serv. 393, 399.

In contrast, although the Zoning Commission must submit proposed maps, regulations, and amendments thereto to the NCPC for comment and review, D.C.Code 1977 Supp., § 5–417(a), *see id.,* § 1–1008(a), nowhere do the statutes give the NCPC a veto over Zoning Commission rulings. This underscores the change in the function of the NCPC from the central planning agency for both the District and federal governments to the central planning agency for only the interests or functions of the federal government in the National Capital. *See* D.C.Code 1973, § 1–1002(e), *as amended by* § 203 of the Home Rule Act, D.C.Code 1974 Supp., § 1–1001 *et seq.* Any other division of power could impede the cooperation in urban planning which both the NCPC and the District government are obliged by Congress to exercise. *See, e. g.,* D.C.Code 1977 Supp., § 1–1002(a)(4)(D) and (F).[15]

This does not mean, however, the the Zoning Commission is at liberty to disregard the comprehensive plan or to give it only lip service. Congress' revision of § 5–414 was an apparent rejection of the circuit court's conclusion that the intent of

---

**13.** The court's actual citation of § 5–413 appears to have been a typographical error.

**14.** Indeed, that decision never constituted controlling precedent in this court. *See M. A. P. v. Ryan,* D.C.App., 285 A.2d 310 (1971). Congress' intervening action has rendered it inapposite.

**15.** For present purposes we may regard planning as the preparation of a comprehensive plan for community development, and zoning as its implementation through legal controls on the use of land. *See* 1 R. Anderson, American Law of Zoning §§ 1.03, 1.11, 1.12 (1968). Division of federal and local roles according to this distinction would harmonize with the purpose of the District of Columbia Self-Government and Governmental Reorganization Act to give the District government more autonomy in local affairs. *See* D.C.Code 1977 Supp., § 1–121. *See generally McLean Gardens Residents' Association, Inc. v. National Capital Planning Commission,* 390 F.Supp. 165, 174 (D.D.C. 1974).

Congress was to make the comprehensive plan "purely advisory to the zoning commission." *Citizens Association of Georgetown, Inc. v. Zoning Commission, supra,* 155 U.S. App.D.C. at 238 n. 16, 477 F.2d at 407 n. 16. The Zoning Commission must accord substantial weight and respect to the NCPC's statutorily authorized commentary, and the record must contain a strong basis for resort to a different interpretation. The Commission's action, moreover, is subject to judicial review by this court in contested cases, D.C.Code 1977 Supp., § 1–1510, and by the Superior Court in other cases. *Chevy Chase Citizens Association v. Council, supra,* at 317 n. 18. Additionally, Congress may alter the legislative structure if it finds that the Zoning Commission is frustrating implementation of the comprehensive plan. U.S.Const. art. I, § 8, cl. 17; D.C.Code 1977 Supp., § 1–126.

In performing our function of judicial review, we must consider the Commission's findings and determinations, but we may not substitute our own judgment so long as there is a rational basis for the Commission's opinion. *Brawner Building, Inc. v. Shehyn,* 143 U.S.App.D.C. 125, 131, 442 F.2d 847, 853 (1971); *see also Citizens Association of Georgetown, Inc. v. Zoning Commission, supra,* 155 U.S.App.D.C. at 238, 477 F.2d at 407. We cannot say, in light of our limited scope of review, that the Commission erred in finding that the rezoning of this particular property would be consistent with the comprehensive plan for the National Capital. In the area involved, the comprehensive plan calls for a predominantly residential development density of 60 to 120 dwelling units per acre. The record reflects that the area's residences are largely single family dwellings. The Commission indicated that it would consider only moderate density increases, limited to the

immediate vicinity of the Metro station. Moreover, the Zoning Advisory Council reported that the Metro station has considerable surplus capacity which would handle an increase in the level of development around it. The Commission's conclusion that the rezoning would not change the predominant use of the area and that it thus would be consistent with the comprehensive plan therefore withstands judicial scrutiny.

Petitioners also contend that the rezoning would have an adverse impact on surrounding historic landmarks. Specifically, the record reflects some concern that the neighborhood and the Barney Circle gateway precinct must be protected from the construction of a 90-foot building, which apparently would obstruct the view.[16] The applicant, however, has imposed on the tract a covenant limiting the maximum height of any building thereon to 65 feet. The Commission refused to consider the covenant in its decision, apparently influenced by the Corporation Counsel's advice to OPM that although such covenants are valid, it would be improper for the District to enter into a covenant for rezoning.[17]

The Commission's refusal to consider the covenant in reaching its decision was erroneous. Initially, we note that covenants running with the land generally are valid and enforceable. *See, e. g., Jameson v. Brown,* 71 App.D.C. 254, 109 F.2d 830 (1939); *Castleman v. Avignone,* 56 App.D.C. 253, 12 F.2d 326 (1926). Furthermore, we find no merit in the concern that the Commission would be engaging in so-called contract zoning by considering the existence of lawful private land use restrictions in its zoning decisions. We share the following views expressed by the Supreme Court of Wisconsin:

> We hold that when a city itself makes an agreement with a landowner to rezone

---

16. The Assistant Director of OPM testified to his belief that construction of a 90-foot building on the site would be inconsistent with the objectives of both the comprehensive plan and the Potomac Avenue Metro Impact Area Report. He stated that a 90-foot building would preclude his recommending approval of the amendment.

17. The Corporation Counsel concluded that it would be contrary to the public interest and the uniformity requirement of D.C.Code 1973, § 5–413, for the District to enter into rezoning agreements which would result in greater use or area restrictions than are generally imposed by the Zoning Regulations upon the type of district to which the property is to be rezoned.

the contract is invalid; this is contract zoning. However, when the agreement is made by others than the city to conform the property in a way or manner which makes it acceptable for the requested rezoning and the city is not committed to rezone, it is not contract zoning in the true sense and does not vitiate the zoning if it is otherwise valid. [*State ex rel. Zupancic v. Schimenz*, 46 Wis.2d 22, 174 N.W.2d 533, 538 (1970).][18]

Private restrictions may provide greater flexibility and control in meeting the demands for rezoning in areas which have undergone recent changes. *See State ex rel. Zupancic v. Schimenz, supra*, at 537. As the New York Court of Appeals has observed: "All legislation 'by contract' is invalid in the sense that the Legislature cannot bargain away or sell its powers.[19] But we deal here with actualities, not phrases." *Church v. Town of Islip*, 8 N.Y.2d 254, 259, 203 N.Y.S.2d 866, 869, 168 N.E.2d 680, 683 (1960). The existence of lawful private restrictions on land use is an actuality properly to be considered in zoning decisions. Although the Commission erroneously refused to consider the covenant in rendering its decision, obviously the same result would have been reached had the Commission properly interpreted the law. *See SEC v. Chenery Corp.*, 318 U.S. 80, 83, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

 Petitioners further complain that the Commission engaged here in unlawful "spot zoning."[20] This contention essentially is a reiteration of the contention that the rezoning contravenes the comprehensive plan. Because the amendment did not violate the plan, this virtually identical argument also must be rejected. *See Palisades Citizens Association v. Zoning Commission, supra*, at 1147. For all of the above-stated reasons, we conclude that the Commission's decision to adopt the map amendment is supported by substantial evidence and that no error of law was committed. Accordingly, Order No. 110 of the Zoning Commission is affirmed.

*Affirmed.*

---

**18.** *See Sylvania Elec. Products, Inc. v. City of Newton*, 344 Mass. 428, 183 N.E.2d 118, 121–22 (1962); *Bucholz v. City of Omaha*, 174 Neb. 862, 120 N.W.2d 270, 276–78 (1963); *Church v. Town of Islip*, 8 N.Y.2d 254, 259, 203 N.Y.S.2d 866, 869, 168 N.E.2d 680, 683 (1960).

**19.** *See Stone v. Mississippi ex rel. Harris*, 101 U.S. 814, 817, 25 L.Ed. 1079 (1880), *quoted in* *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977).

**20.** "The term 'spot zoning' is used by the courts to describe a zoning amendment which is invalid because it is not in accordance with a comprehensive or well-considered plan." 1 R. Anderson, *supra*, § 5.04, at 240. The phrase is largely pejorative.